In re SOUTHERN STAR FOODS, INC., Debtor.

Kenneth G.M. MATHER, Trustee for the Estate of Southern Star Foods, Inc., Plaintiff,

v.

OKLAHOMA EMPLOYMENT SECURITY COMMISSION, Defendant.

Bankruptcy No. 94–71621.
Adv. No. 95–7044.

United States Bankruptcy Court,
E.D. Oklahoma.

Dec. 19, 1995.

Pamela H. Goldberg, Tulsa, OK, for plaintiff.

David T. Hopper, Oklahoma City, OK, for defendant.

## MEMORANDUM OPINION AND ORDER

MICKEY DAN WILSON, Chief Judge.

This adversary proceeding was submitted for decision on stipulated facts and briefs. Upon consideration thereof, and of the rec-

ord herein, this Court finds, concludes and orders as follows.

## FINDINGS OF FACT

The parties have stipulated to certain facts; and other facts, which help explain and properly frame the issue(s) herein, appear in the record to be substantially undisputed.

On December 3, 1994, a petition for involuntary relief under 11 U.S.C. Chapter 7 was filed in this Court against Southern Star Foods, Inc. ("debtor"). On the same day, the petitioning creditors filed a document entitled "Application for Temporary Order to Prohibit Any Transfer of Assets Pending Hearing on Relief." This application alleged that debtor intended to convey substantially all of its assets on December 30, 1994.

On December 19, 1994, the Oklahoma Employment Security Commission ("OESC") filed its State of Oklahoma Unemployment Tax Warrant ("the tax warrant") in the office of the Pittsburg County Clerk for unpaid unemployment taxes owed by Southern Star Foods, Inc. ("debtor") for the third quarter of 1994, in the amount of $14,955.03 plus accruing interest, stip. ¶ 1.

On December 28, 1994, debtor filed an objection to the application, alleging that debtor and one James Mills ("Mills") had agreed to sell most of debtor's fixed assets and certain equipment purportedly owned by Mills to Simmons Poultry Farms, Inc. ("Simmons") for a total sale price of approximately $4 million; that the sale must close on December 30, 1994; and that debtor intended to pay from the sale proceeds all secured claims and ad valorem taxes, totalling over $3 million, against debtor's assets to be sold.

On December 28, 1994, the petitioning creditors' application and debtor's objection thereto came on for hearing before the Honorable Tom R. Cornish, United States Bankruptcy Judge ("Judge Cornish"). At said hearing, debtor was prepared to introduce evidence, including its exhibit no. 6, "Statement of Payoff Balances." This document recites as follows:

Obligations which must be paid to close sale:

| | | | |
|---|---|---|---|
| Southern Star Foods, Inc.: | | | $3,318,623.88 |
| 1. | Bank, N.A.—mortgage filed Book 769 p 229 ($2,000,000.00)<br>$1,005,523.79<br>259,537.32<br>―――――――――<br>$1,265,061.11 | | $1,265,061.11 |
| 2. | Rural Enterprises, Inc.—mortgage assigned to SBA—Book 777 p 370 | | $1,086,771.87 |
| 3. | McAlester Economic Development Service, Inc.<br>Mortgage filed Book 779 p 321 | | $ 461,007.60 |
| 4. | OESC Warrant # 005925–94 | | $ 14,995.03 |
| 5. | IRS—Federal Tax Lien | | $ 197,314.61 |
| 6. | OTC—Tax Warrant | | $ 22,600.31 |
| 7. | 1994 Ad Valorem Taxes | | $ 9,296.92 |
| 8. | W.R. Norris—fixtures filed | | $ 262,500.00 |
| | | SUBTOTAL | $3,319,547.45 |

Lease buyouts required by Sale Contract:

| | | | |
|---|---|---|---|
| 9. | Northfield Freezing Systems | | $ 275,000.00 |
| 10. | Kemco Systems, Inc. | | $ 25,241.32 |
| | | SUBTOTAL | $ 300,241.32 |
| | | CUMULATIVE SUBTOTAL | $3,619,788.77 |

| | | | |
|----|-------------------|-----------|--------------|
| 11. | IRS 4th Quarter | $ | 81,219.57 |
| 12. | OTC Withholding | $ | 6,846.49 |
| 13. | OESC | $ | 12,126.06 |
| | SUBTOTAL | $ | 100,192.12 |
| | CUMULATIVE TOTAL | | $3,719,980.89 |

—see OESC's response brief, ex. A. At said hearing, Judge Cornish decided to allow the sale to take place.

All alleged secured and tax creditors were paid from the sale proceeds, by cashier's checks purchased by Simmons and dated December 29, 1994 or December 30, 1994. See Trustee's trial brief, p. 2. Among these was OESC.

On December 30, 1994, OESC received cashier's check no. 228635 issued by the Bank, N.A. of McAlester, Oklahoma, dated December 30, 1994, which was purchased by Simmons in the amount of $24,344.36, and allocated as part of the sales price for the debtor's assets involved in the sale, stip. ¶ 3. The amount paid to OESC was comprised of:

(1) $15,104.58 representing debtor's unpaid unemployment taxes for the 3rd quarter of 1994, plus accrued interest, and which amount was covered by the tax warrant, stip. ¶ 5;

(2) $9,239.78 representing debtor's unemployment taxes for the 4th quarter of 1994, and which amount was not covered by the tax warrant, *id.;*

(3) $8.00 in penalties, stip. ¶ 8; and

(4) an overpayment of $141.55, stip. ¶ 9. Debtor's 3rd quarter 1994 taxes had been due on October 31, 1994, and were paid two months late on December 30, 1994, stip. ¶ 6. Debtor's 4th quarter 1994 taxes were not due until January 31, 1995, and were paid one month early on December 30, 1994, stip. ¶ 7.

On January 3, 1995, Judge Cornish's order allowing the sale to close was filed and docketed. Said order reads in its entirety as follows:

This matter comes on for hearing on this 28th day of December, 1994, upon the Request of the Petitioners for an Order Restraining the Debtor from selling assets herein. Betty Williams appears for the Petitioners herein and Ron Wright appears for Southern Star Foods, Inc. Donald Hackler appears for The Bank, N.A. and Paul Thomas appears for the U.S. Trustee. The Court finds that facsimile notice has been given to all interested parties as reflected by the Affidavit of Notice filed herein by Ron Wright. After the Court heard statements of counsel the parties reached an agreement which was announced as follows:

1. The Petitioners withdraw their request for a Restraining Order.

2. The Sale contemplated by Southern Star Foods, Inc. to Simmons Poultry Farms, Inc. will be allowed to close.

3. The sale proceeds reflected to James Mills ($931,376.12) will be paid to Idabel National Bank ($546,799.35) and McCurtain County National Bank ($384,576.77) to be placed in certificates of deposit to be held by the respective banks as collateral for the Notes of James Mills to such banks secured by the equipment which Mills asserts is owned by him and leased to Southern Star Foods, Inc.

The Certificates of Deposit will be held by such Banks until there has been a written agreement to apply the funds signed by counsel for Petitioners, Mills, the Banks and the U.S. Trustee's Office, or a final Order of the Bankruptcy Court.

4. Respondent, Southern Star Foods, Inc., agrees to file an Answer to the Involuntary Bankruptcy Petition on January 6, 1995 in which Respondent will confess the Petition for Relief.

5. Southern Star Foods, Inc. will execute a waiver of financial privacy to allow counsel for Petitioners to obtain financial information from Southern Star Foods' banking institutions.

The foregoing is hereby adopted as the Order of the Court this 28th day of December, 1994.

**IT IS SO ORDERED.**

—see OESC's response brief, ex. B. Said order is silent as to when the sale may close, and does not expressly authorize the distribution of any sale proceeds attributable to debtor's assets, stip. ¶ 4.

On January 11, 1995, Judge Cornish entered an order for relief against debtor under 11 U.S.C. Chapter 7. On January 24, 1995, Kenneth G.M. Mather was appointed Trustee ("the Trustee") of debtor's bankruptcy estate, and has continued to serve in that capacity to the present. The Trustee sued various creditors of debtor who were paid portions of the sale proceeds, in the belief that such payments were unauthorized transfers which are avoidable, recoverable, and subject to subordination under 11 U.S.C. §§ 542, 549, 550, and 724. Among these creditors is OESC, defendant in this adversary proceeding.

### CONCLUSIONS OF LAW

This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (E), (M), (N), (O).

The Court adopts the statements of "Issues for Trial" and "Arguments and Authorities" in the "Plaintiff's Trial Brief" filed herein on September 29, 1995, and incorporates the same herein by reference. However, these statements serve only to establish the Trustee's *prima facie* case; they do not meet certain special defenses raised by OESC in its response brief.

■ OESC argues, first, that the distribution of the sale proceeds was actually approved by Judge Cornish at the hearing on December 28, 1994, such that the payment to OESC from the sale proceeds was actually an "authorized" transfer for purposes of 11 U.S.C. § 549(a)(2)(B). Although Judge Cornish's written order is stipulated to be silent on the matter, OESC argues that Judge Cornish implicitly approved distribution of the proceeds, because the debtor's exhibit no. 6 stated that such distribution "must be paid to close sale," and Judge Cornish ordered that "[t]he Sale ... will be allowed to close."

This argument is not persuasive, for several reasons. First, it is not clear from the record now before this Court that exhibit no. 6 was actually introduced and admitted, or otherwise called to Judge Cornish's attention. Judge Cornish's order recites that the Judge merely "heard statements of counsel," and says nothing of the receipt of evidence. Second, Judge Cornish's order neither says nor suggests that the "Sale will be allowed to close" *as provided in* any exhibit, statement of closing costs, or other identifiable document. Third, and most important, exhibit no. 6 lists approximately one dozen purported secured, tax and other creditors, all of whom, according to OESC, "must [have been] paid to close sale." It is not plausible that Judge Cornish would, at an emergency hearing in an involuntary case, based on nothing but "statements of counsel" and an "agreement" among those parties in interest who happened to be present, decide effectively to determine the validity and priority of each and all of those dozen claims, *as they appeared under nonbankruptcy law,* waiving the bankruptcy estate's interest therein and frustrating the priority and distribution scheme of the Bankruptcy Code, immediately before allowing the debtor to confess involuntary bankruptcy and proceed under that very Code whose provisions had just been frustrated. It is far more plausible that Judge Cornish would, at such an emergency hearing on an imminent sale, merely authorize the sale to take place, reserving for a later time the question of how the sale proceeds should and would be distributed. This Court declines to read extrinsic conditions into Judge Cornish's order, or to draw implausible inferences from it. The order does not authorize distribution of the sale proceeds; therefore distribution of the sale proceeds was not authorized.

■ OESC argues, second, that Congress lacks the power to abrogate the State of Oklahoma's sovereign immunity, at least pursuant to the Bankruptcy Clause of Article I of the United States Constitution; and that 11 U.S.C. § 106(a), which purports to exercise such power, is unconstitutional.

This Court has encountered the defense of sovereign immunity once before. In *In re Vance*, 120 B.R. 181 (B.C., N.D.Okl.1990), it was invoked by a Federal officer seeking immunity from judicial review. This Court commented,

> The doctrine owes its conceptual basis in part to the medieval notion that "the King can do no wrong," 72 AM.JUR.2D (1974) "States" § 99 p. 491, but see *Langford v. U.S.*, 101 U.S. 341, 25 L.Ed. 1010 (1880), in part to the totalitarian speculations of Hobbes, *Kawananakoa v. Polyblank*, 205 U.S. 349, 353, 27 S.Ct. 526, 527, 51 L.Ed. 834, 836 (1907); it is incongruous in a modern constitutional republic where the people are sovereign yet all men are supposedly equal before the law. It has obvious uses in guarding against inroads on the public purse, harassment of public officers and obstruction of public policies; but as applied [to shield government officers or agencies from wrongdoing] it is an imposition on a free people,

*In re Vance*, 120 B.R. p. 189. Here, it is invoked by a State agency against the enforcement in this Court of a Federal law.

OESC invokes the authority of Alexander Hamilton, writing in *The Federalist, No. 81*, quoted by OESC as follows:

> It is *inherent in the nature of sovereignty* [emphasis added by OESC], not to be amendable [sic; amenable] to the suit of an individual without its consent [original emphasis on the words *without its consent* deleted by OESC without acknowledgment]. This is the general sense, and the general practice of mankind; and the exemption, as one of the attributes of sovereignty, is now enjoyed by the Government of every State in the Union. Unless, therefore, there is a surrender of this immunity in the plan of the Convention, it will remain with the States[.]

Response brief p. 4. OESC subtly alters Hamilton's passage, to shift emphasis to "the nature of sovereignty" and away from "consent [to be sued]" or "a surrender of this immunity in the [Constitution]." In any event, "Hamilton's forecast here was incorrect as was shown when the majority of the Supreme Court, including Jay, then Chief Justice, gave its decision in *Chisholm v. Georgia* ...," Max Beloff (ed.), *The Federalist* (Basil Blackwell, 2nd ed.1987) p. 484 n. 40.

In *Chisholm v. Georgia*, 2 Dall. 419, 2 U.S. 419, 1 L.Ed. 440 (1793), four out of five Justices of the U.S. Supreme Court agreed that the State of Georgia could be sued in Federal court by a citizen of the State of South Carolina, notwithstanding Georgia's asserted sovereign immunity. Justice Blair pointed out that there was no exemption from such suit in Article III of the Constitution;

> and if sovereignty be an exemption from suit in any other than the sovereign state's own courts, it follows that when a state, by adopting the constitution, has agreed to be amenable to the judicial power of the United States, she has, in that respect, given up her right of sovereignty,

*id.* 2 U.S. p. 452, 1 L.Ed. p. 454. Justice Wilson pointed out that the people, not the States, are sovereign; and asked, " 'do the people of the United States form a nation?' ", 2 U.S. p. 453, 1 L.Ed. p. 455. He answered as follows:

> Whoever considers, in a combined and comprehensive view, the general texture of the constitution, will be satisfied, that the people of the United States intended to form themselves into a nation for national purposes. They instituted for such purposes, a national government, complete in all its parts, with powers legislative, executive, and judiciary; and in all those powers extending over the whole nation. Is it congruous, that, with regard to such purposes, any man, or body of men, any person, natural or artificial, should be permitted to claim successfully an entire exemption from the jurisdiction of the national government? Would not such claims, crowned with success, be repugnant to our very existence as a nation?

*id.* 2 U.S. p. 465, 1 L.Ed. p. 460. He invoked the ancient maxim, " 'It would be superfluous to make laws, unless those laws, when made, were to be enforced,' " *id.* 2 U.S. p. 464, 1 L.Ed. p. 460. Given a national government, with power to make national laws, it necessarily followed that such laws were enforceable, against the States as well as against

individual citizens, in the courts of the United States. Justice Cushing reasoned,

> ... [I]t may be insisted, that this will reduce states to mere corporations, and take away all sovereignty. As to corpora-·tions, all states whatever are corporations or bodies politic. The only question is, what are their powers? As to individual states and the United States the constitution marks the boundary of powers. Whatever power is deposited with the union by the people for their own necessary security, is so far a curtailing of the power and prerogatives of states. This is, as it were, a self-evident proposition ... thus the power of declaring war, making peace, raising and supporting armies for public defence, levying duties, excises and taxes, if necessary, with many other powers, are lodged in Congress; and are a most essential abridgment of state sovereignty ... [T]hese with a number of others, are important restrictions of the power of state, and were thought necessary to maintain the union; and to establish some fundamental uniform principles of public justice, throughout the whole union. So that I think, no argument of force can be taken from the sovereignty of states. Where it has been abridged, it was thought necessary for the greater indispensable good of the whole. If the constitution is found inconvenient in practice in this or any other particular, it is well that a regular mode is pointed out for amendment. But, while it remains, all offices legislative, executive, and judicial, both of the states and of the union, are bound by oath to support it,

*id.* 2 U.S. p. 468, 1 L.Ed. p. 461. Chief Justice Jay pointed out that the doctrine of state immunity from suit derived from "feudal ideas" of aristocracy and kingship, *id.* 2 U.S. p. 471, 1 L.Ed. pp. 462–463.

> No such ideas obtain here; at the revolution, the sovereignty devolved on the people; and they are truly the sovereigns of the country ...
>
> ... Sovereignty is the right to govern ... In Europe the sovereignty is generally ascribed to the prince; here it rests with the people ... Their princes have personal powers, dignities, and pre-eminences, our rulers have none but official; nor do they partake of the sovereignty otherwise, or in any other capacity, than as private citizens.

> .      .      .      .      .

> [Sovereign immunity from suit] would not correspond with the equal rights we claim; with the equality we profess to admire and maintain, and with that popular sovereignty in which every citizen partakes.

> .      .      .      .      .

> ... The attention and attachment of the Constitution to the equal rights of the people are discernable in almost every sentence of it ...

[State amenability to suit in Federal court] appears to me to be wise, because it is honest, and because it is useful. It is honest, because it provides for doing justice without respect of persons, and by securing individual citizens as well as states, in their respective rights, performs the promise which every free government makes to every free citizen, of equal justice and protection. It is useful, because it is honest, because it leaves not even the most obscure an[d] friendless citizen without means of obtaining justice ... because it recognizes and strongly rests on this great moral truth, that justice is the same whether due from one man or a million, or from a million to one man; because it teaches and greatly appreciates the value of our free republican national government, which places all our citizens on an equal footing, and enables each and every one of them to obtain justice without any danger of being overborne by the weight and number of their opponents; and, because it brings into action, and enforces this great and glorious principle, that the people are the sovereign of this country, and consequently that fellow citizens and joint sovereigns cannot be degraded by appearing with each other in their own courts to have their controversies determined,

*id.* 2 U.S. pp. 471–473, 478–479, 1 L.Ed. pp. 463, 466.

The narrow ruling of *Chisholm v. Georgia,* that a State could be sued in Federal court

by a citizen of another State, was overruled by the Eleventh Amendment. In effect, an "inconvenien[ce] in practice" of the sort noted by Justice Cushing was remedied, as Justice Cushing recommended, by "a regular mode ... for amendment." The Eleventh Amendment does not purport to overrule the principle on which *Chisholm v. Georgia* was based, i.e., sovereignty of the people, embodied in their National government, and for national purposes superior to the sovereignty of the States. In 1861, a minority of disgruntled States attempted to overrule *Chisholm v. Georgia's* basic principles by armed force. Their argument was met with a stronger one. In 1868, the winning argument of the Union was formalized in the Fourteenth Amendment to the Constitution. That Amendment reads in pertinent part as follows:

Section 1.... No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

> .   .   .   .   .

Section 5. The Congress shall have power to enforce, by appropriate legislation, the provisions of this article.

This Amendment is usually thought of as a response to slavery; but it can also be seen as a virtual codification of the basic principle (though not the narrow ruling) of *Chisholm v. Georgia.* The Fourteenth Amendment provides that citizens of the United States may rely upon their national Congress to enforce their national rights against the States.

In short, there has been, in Hamilton's words, "a surrender of this immunity in the [Constitution]." According to the Supreme Court in *Chisholm v. Georgia,* such "surrender" occurred with the adoption of the Constitution in 1789; but if there be any doubt on that score, it certainly occurred with the ratification of the Fourteenth Amendment in 1868.

■ In 1890, a different U.S. Supreme Court used the Eleventh Amendment as a vehicle for re-importing the doctrine of State sovereign immunity into our Constitutional law, *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890). Since then, *Hans v. Louisiana* has been limited, and the Fourteenth Amendment remembered and re-enforced to a considerable extent, *Fitzpatrick v. Bitzer,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976); *Pennhurst State School and Hospital v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984); *Atascadero State Hospital v. Scanlon,* 473 U.S. 234, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985). In 1987, *Hans v. Louisiana* escaped overruling by an evenly divided Court, see *Welch v. Texas Dept. of Highways and Public Transportation,* 483 U.S. 468, 107 S.Ct. 2941, 97 L.Ed.2d 389 (1987). Since then, our existing jurisprudence regarding the Eleventh Amendment and State so-called sovereign immunity has been criticized from left, right, and center, *Atascadero State Hospital v. Scanlon,* supra, 473 U.S. pp. 247–304, 105 S.Ct. pp. 3150–3178, 87 L.Ed.2d pp. 183–218 (dissenting opinion by Justice Brennan); *Pennsylvania v. Union Gas Co.,* 491 U.S. 1, 29–45, 109 S.Ct. 2273, 2296–2304, 105 L.Ed.2d 1, 25–36 (1989) (concurring/dissenting opinion by Justice Scalia), *id.* 491 U.S. pp. 23–29, 109 S.Ct. pp. 2286–2289, 105 L.Ed.2d pp. 22–25 (concurring opinion of Justice Stevens). But it remains the rule that, pursuant to Section 5 of the Fourteenth Amendment, Congress may abrogate the States' so-called sovereign immunity, notwithstanding the Eleventh Amendment, if Congress does so in clear and unequivocal statutory language, *Pennsylvania v. Union Gas Co.,* 491 U.S. pp. 5–23, 109 S.Ct. pp. 2276–2286, 105 L.Ed.2d pp. 10–22 (majority opinion); *Dellmuth v. Muth,* 491 U.S. 223, 109 S.Ct. 2397, 105 L.Ed.2d 181 (1989); *Hoffman v. Connecticut Dept. of Income Maintenance,* 492 U.S. 96, 109 S.Ct. 2818, 106 L.Ed.2d 76 (1989).

In its original version, 11 U.S.C. § 106 was held insufficient to abrogate sovereign immunity, *Hoffman v. Connecticut Dept. of Income Maintenance,* supra; *U.S. v. Nordic Village,* 503 U.S. 30, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992). In 1994, the statute was amended. The language used by Congress in the amended, presently effective version of 11 U.S.C. § 106(a) is as clear and unequivo-

**426**

cal an abrogation of State sovereign immunity, as against actions such as this one under 11 U.S.C. §§ 542, 549, 550, 724, as could possibly be expressed in words.

There remains the question whether, in enacting 11 U.S.C. § 106(a) with its clear and unequivocal abrogation of State sovereign immunity, Congress acted pursuant to its enforcement powers under Section 5 of the Fourteenth Amendment. It is proposed by some that the enforcement powers of the Fourteenth Amendment do not apply "to antecedent provisions of the Constitution," *Pennsylvania v. Union Gas Co.*, 491 U.S. p. 42, 109 S.Ct. p. 2303, 105 L.Ed.2d p. 34 (in concurring/dissenting opinion by Justice Scalia), such as the Commerce Clause, *id.*, or Article I's bankruptcy clause, *Hoffman v. Connecticut Income Dept.*, 492 U.S. p. 105, 109 S.Ct. p. 2825, 106 L.Ed.2d p. 86 (concurring opinion of Justice Scalia).

This could be true only if such "antecedent powers" did *not* implicate "the privileges or immunities of citizens of the United States . . . life, liberty or property . . . due process of law . . . [or] the equal protection of the laws" guaranteed by the Fourteenth Amendment. But Congress' exercise of its basic national legislative powers under any of the provisions of Article I will usually (if not invariably) implicate "the privileges or immunities of citizens of the United States . . . life, liberty or property . . . due process of law . . . [or] the equal protection of the laws." A State cannot limit the exercise by a citizen of the United States of a right conferred by a valid act of Congress, *McConnell v. Thomson*, 213 Ind. 16, 8 N.E.2d 986 (1937). Article I of the Constitution gives the national government power to legislate on the subject of bankruptcy; and the national government has done so, by creating the complex of privileges and immunities, rights and liabilities, found in the Bankruptcy Code. The Bankruptcy Code is intended to provide all American citizens with the following: the privilege of efficient liquidation or other use and ratable distribution of a debtor's assets, or (to put it another way) with immunity from the inefficient liquidation or use and inequitable distribution of a debtor's assets which may obtain under State laws; the priv-

ilege of discharge, or (to put it another way) with immunity from oppressive debt collection which may obtain under State laws; liberty from economic bondage, and protection against undue loss of value of property in exigent financial circumstances; and fair and efficient determination of all of the above, according to the process due in a national court of equitable jurisdiction, without regard to persons or to any special privileges save those considered by Congress to be justified as a matter of policy.

Although such laws are enacted "pursuant to Article I," they are enforceable "through the Fourteenth Amendment." To attempt to separate the power of national enactment under Article I from the power of national enforcement under the Fourteenth Amendment is to mince the Constitution—to take what should be considered as a working whole, and dismember it into a scatter of lifeless parts. This Court declines to do so. It is apparent to this Court that 11 U.S.C. § 106(a), even though enacted "pursuant to Article I," is also a valid exercise of Congressional enforcement power, including the power to abrogate State sovereign immunity, "through the Fourteenth Amendment."

In so ruling, this Court believes that it does no violence to the public policy or the legitimate sovereignty of the State of Oklahoma. In *Vanderpool v. State*, 672 P.2d 1153 (Okl.1983), the Supreme Court of Oklahoma abrogated sovereign immunity with respect to tort suits against government agencies, noting as follows:

> Reexamination of the soundness of the concept of governmental immunity in the light of the expanded role of government in today's society has, for various reasons . . . resulted in a retreat from the concept both legislatively and by case law . . . and abrogating it in whole or in part, until today, there are not more than five states, including Oklahoma, which have not abolished the doctrine or have not, in some manner, retreated from its universal application as an immutable concept of the law.

. . . . . .

In rendering this opinion, this Court is mindful of the oft-expressed view of this Court that if the doctrine of sovereign

immunity is to be totally abrogated, such should be done by the Legislature and not by the courts of this State. But having come to the conclusions that the judicially recognized doctrine of governmental immunity in its present state under the case law is no longer supportable in reason, justice or in light of the overwhelming trend against its recognition, our duty is clear. Where the reason for the rule no longer exists, that alone should toll its death knell,

*id.* pp. 1155, 1157.

Since the Trustee has established his *prima facie* case, and since OESC's special defenses are rejected, the Court concludes that judgment shall issue in favor of the Trustee, as stated in the "Conclusion" to the above-mentioned "Plaintiff's Trial Brief."

AND IT IS SO ORDERED.