In re SOUTHERN STAR FOODS, INC., Debtor.

Kenneth G.M. MATHER, Trustee for the Estate of Southern Star Foods, Inc., Plaintiff,

v.

NORTHFIELD FREEZING SYSTEMS, INC., a Minnesota corporation, Defendant.

Bankruptcy No. 94–71621.
Adv. No. 96–7045.

United States Bankruptcy Court, E.D. Oklahoma.

Nov. 26, 1996.

---

Pamela H. Goldberg, Hall, Estill, Hardwick, Gable, Golden, & Nelson, Tulsa, OK, for plaintiff.

Jeffrey D. Hassell, Gable, Gotwals, Mock & Schwabe, Tulsa, OK, for defendant.

## *MEMORANDUM OPINION AND ORDER*

MICKEY DAN WILSON, Bankruptcy Judge.

This adversary proceeding was submitted for decision on stipulations and briefs. Upon consideration thereof, and of the record herein, this Court, pursuant to F.R.B.P. 7052, now finds, concludes, and orders as follows.

### *FINDINGS OF FACT*

Southern Star Foods, Inc. ("Southern Star") is an Oklahoma corporation whose business, located mainly in McAlester, Oklahoma, was the processing and marketing of chicken parts. Northfield Freezing Systems, Inc. ("Northfield") is a Minnesota corporation whose business, headquartered in Northfield, Minnesota, is the manufacturing and selling of meat freezing and processing equipment.

On or about March 10, 1992, Southern Star entered into a certain agreement ("the agreement") with Northfield. Pursuant thereto, Northfield delivered to Southern Star and installed a freezing system designed to freeze a certain quantity of raw chicken breasts and other parts, a spiral conveyor for processing chickens, various controls and other related

equipment (collectively "the equipment"). See stips. "Background Facts" p. 4 ¶¶ 1–2.

The agreement is entitled "Lease Agreement" (and is sometimes referred to herein as "the 'lease'"). It designates Northfield as "lessor" and Southern Star as "lessee". Pursuant thereto, Southern Star agreed to pay Northfield $45,000 on the date of the agreement plus $8,364 per month for the full sixty (60) month term of the lease. Southern Star was required to care for the equipment, perform all repairs and maintenance to the equipment, assume all risk of loss and damage to the equipment, insure the equipment in certain amounts, and pay all taxes related to the equipment. Southern Star had no right to terminate the "lease". Upon Northfield's receipt of the final payment, ownership of the equipment would transfer automatically to Southern Star. See stips. "Background Facts" pp. 4–5 ¶¶ 3–6. The agreement provides that it "shall be construed under the laws of Minnesota", stips. ex. A p. 8 ¶ XVIII. Appended to the agreement is a detailed itemization and description of the equipment.

At the time of the agreement, Northfield was in the business of manufacturing and selling the same type of equipment "leased" to Southern Star. Approximately 90% of all of Northfield's sales at that time were for cash, with no financing provided by Northfield. Of the remaining 10%, approximately one-half were accomplished by "leases" similar to the agreement with Southern Star, including provision that title would pass to the "lessee" upon Northfield's receipt of the last payment contemplated by the "lease". Northfield called this type of agreement a "finance lease". The other one-half of the remaining 10% were accomplished by "leases" differing from the agreement with Southern Star, in that a purchase option existed which could be exercised at the end of the "lease" term for a purchase price equal to the fair market value of the equipment at that time. Northfield called this type of agreement an "operating lease". See stips. "Background Facts" p. 5 ¶ 8.

On or about September 11, 1992, Northfield caused to be filed in the U.C.C. records of the county clerk of Oklahoma County, Oklahoma, a financing statement, naming Southern Star as "Debtor" and Northfield as "Secured Party", and "cover[ing] the following types (or items) of property":

> Northfield Single Spiral Freezer System including spiral, belt, controls, fans, coils, baffling, enclosure, belt washer and stainless steel pan floor covering per lease agreement dated March 10, 1992. See nine attached specification pages for further description. Estimated start of installation is September 15, 1992. This is a lease and not a security agreement. "This matter is being recorded to memorialize the transaction."

On or about September 21, 1992, Northfield caused a similar financing statement to be filed in the U.C.C. records of the county clerk of Pittsburg County, Oklahoma. See stips. "Background Facts" p. 5 ¶ 7.

Northfield accounted for the transaction with Southern Star as a sale to Southern Star financed by Northfield, booking income in the year 1992 and interest income in the years when payments were received under the "lease". Southern Star accounted for the transaction with Northfield as a sale to Southern Star financed by Northfield, booking the "lease" as a note payable and the equipment as an asset of Southern Star, which Southern Star depreciated for its own tax purposes. See stips. "Background Facts" p. 6 ¶¶ 9–10.

On December 1, 1994, Southern Star and its affiliate James Mills ("Mills") entered into a contract with Simmons Poultry Farms, Inc. ("Simmons"). Pursuant thereto, Simmons would pay $3,318,623.88 to Southern Star as the purchase price of virtually all of Southern Star's fixed assets (not including accounts receivable and poultry inventory) and $931,376.12 to Mills for certain items allegedly owned by Mills but used by Southern Star. Secured claims and ad valorem taxes against Southern Star's assets were to be paid from the sale proceeds. The sale was to close by December 30, 1994. See stips. "Procedural History" pp. 2–3 ¶¶ 2–4, "Background Facts" p. 6 ¶ 12.

On about December 13, 1994, Southern Star contacted Northfield, and asked what

sum Northfield would accept in return for a release of Southern Star from its obligations under the "lease". Northfield advised Southern Star that it would release Southern Star from the "lease" for $270,000 if received by December 15, 1994, or for $275,000 if received by December 31, 1994. See stips. "Background Facts" p. 6 ¶ 11.

On December 23, 1994, certain creditors of Southern Star ("petitioners") filed a petition in involuntary bankruptcy under 11 U.S.C. Chapter 7 against Southern Star in this Court, commencing the above-styled bankruptcy case. On the same date, petitioners filed an "Application for Temporary Order to Prohibit Any Transfer of Assets Pending Hearing on Relief" ("the application"), alleging that Southern Star intended to convey substantially all its assets on December 30, 1994, and asking the Court to prohibit Southern Star from transferring any of its assets outside the ordinary course of business pending a hearing on the involuntary petition. On December 28, 1994, Southern Star filed its "Objection ..." to petitioners' application, reciting the terms of the contract with Simmons, and declaring its intention to pay from the sale proceeds all secured claims and ad valorem taxes in the amount of $3,319,547.45. See stips. "Procedural History" pp. 2–3 ¶¶ 2–4.

On December 28, 1994, the application and objection came on for hearing before the Honorable Tom R. Cornish, United States Bankruptcy Judge for the Eastern District of Oklahoma ("Judge Cornish"). At this hearing, the parties entered into a settlement agreement which allowed the sale to Simmons to close and an order for relief to be entered against Southern Star. This settlement was approved by Judge Cornish from the bench.

The sale actually closed on or about December 30, 1994. Simmons paid various creditors of Southern Star, including Northfield. See In re Southern Star Foods, Inc., 190 B.R. 419, 421, 422 (B.C., E.D.Okl.1995). On or about December 30, 1994, Simmons sent Northfield a cashier's check in the amount of $275,000, which was intended by Simmons and Northfield to represent the agreed discounted payoff of Southern Star's obligations under the "lease". At the same time, Simmons asked Northfield to prepare "U.C.C.–1" termination statements and to send them to Simmons as soon as they were prepared. See stips. "Background Facts" p. 6 ¶ 13.

On January 3, 1995, a written memorialization of Judge Cornish's order was filed and docketed. This written order does not expressly state when the sale would close, and does not expressly authorize the distribution of proceeds from the sale of any of Southern Star's assets. On January 6, 1995, Southern Star filed its answer to the involuntary petition, consenting to the entry of an order for relief against itself under 11 U.S.C. Chapter 7. See stips. "Procedural History" p. 3 ¶¶ 5–7.

On or about January 9, 1995, Northfield mailed the termination statements to Simmons. The termination statements were filed with the county clerks of Oklahoma County and Pittsburg County, Oklahoma. See stips. "Background Facts" pp. 6–7 ¶ 13.

On January 11, 1995, this Court entered its order for relief under 11 U.S.C. Chapter 7 against Southern Star. On January 23, 1995, Kenneth G.M. Mather was appointed Trustee ("the Trustee") of Southern Star's bankruptcy estate, and continues in that capacity to the present time. See stips. "Procedural History" p. 3 ¶¶ 8–9.

The Trustee sued various creditors of Southern Star who had been paid portions of the sale proceeds, in the belief that such payments were unauthorized by Judge Cornish. See In re Southern Star Foods, Inc., supra, 190 B.R. p. 422. Among these creditors is Northfield. On May 1, 1996, the Trustee filed his complaint commencing this adversary proceeding against Northfield. The Trustee asserted three causes of action. The second has been dismissed with prejudice. The first and third were submitted for decision on stipulations and briefs. See stips. "Procedural History" pp. 3–4 ¶¶ 10–11. On October 15, 1996, the parties filed their "Agreed Stipulations of Law and Fact" ("stips."). On October 31, 1996, the parties filed simultaneous "... Trial Brief[s]".

Thereafter, the Court took the matter under advisement.

### CONCLUSIONS OF LAW

This is a core proceeding pursuant to 28 U.S.C. § 157(b), 11 U.S.C. §§ 542, 544, 549, 550. See stips. "Stipulations" p. 1 ¶ 1.

■ The agreement provides that it shall be construed under Minnesota law. Nevertheless, the Trustee argues solely in terms of Oklahoma law; and Northfield argues in terms of "the 'UCC'," by which Northfield means "the version of the Uniform Commercial Code currently in effect in Oklahoma", Northfield's brief p. 3 and n. 1. Since both parties present the issues in terms of Oklahoma law, in effect waiving the agreement's provision to the contrary and acknowledging the propriety of applying Oklahoma law to the transaction(s) in question, the Court decides the issues under Oklahoma law.

■ 12A O.S. § 1–201(37) provides in pertinent part as follows:

(a) "Security interest" means an interest in personal property or fixtures which secures payment or performance of an obligation ...

(b) Whether a transaction creates a lease or security interest is determined by the facts of each case; however, a transaction creates a security interest if the consideration the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease not subject to termination by the lessee, and:

. . . . .

(ii) the lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods,

. . . . .

(iv) the lessee has an option to become the owner of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement.

Here, the agreement required Southern Star to pay for the equipment over the term of the "lease" not subject to termination by South-ern Star, whereupon Southern Star would become the owner of the equipment for no additional consideration. Accordingly, under 12A O.S. § 1–201(37), the "lease" agreement between Southern Star and Northfield was not a true lease but a thinly disguised sale, which created a security interest as a matter of law. Northfield concedes as much, Northfield's brief p. 4ff.

■ The Trustee argues that, even though the "lease" creates a security interest as a matter of law under 12A O.S. § 1–201(37), said "lease" is not enforceable as a security agreement under 12A O.S. § 9–203(1)(a). That statute provides in pertinent part that "a security interest is not enforceable ... and does not attach unless ... the debtor has signed a security agreement which contains a description of the collateral ..." Here, Southern Star by its authorized agent signed an agreement, which created a security interest as a matter of law and is therefore fairly described as a "security agreement", to which is appended a description of the collateral whose sufficient identification of the collateral is not questioned. But, says the Trustee, caselaw requires that

"... there must be language in the instrument which 'leads to the logical conclusion that it was the intention of the parties that a security interest be created[,]' "

*Mitchell v. Shepherd Mall State Bank,* 458 F.2d 700, 703 (10th Cir.1972) quoting *Evans v. Everett,* 183 S.E.2d 109, 113 (N.C.1971) quoting *In re Nottingham,* 6 U.C.C.R. 1197, 1199, 1969 WL 11098 (D.Tenn.1969) (hereinafter "*Mitchell*"). The Trustee argues that, since the "lease" agreement assiduously avoids any express mention of the granting of a security interest (and is supplemented by a financing statement which expressly denies that any security agreement was intended), it is not a "security agreement" sufficient under 12A O.S. § 9–203(1)(a) as interpreted by *Mitchell.*

It is true that 12A O.S. §§ 1–201(37) and 9–203(1)(a) have different purposes. The former deals with interpretation and classification of a contract; the latter is in the nature of a statute of frauds. Even so, the Trustee's argument borders on internal in-

consistency. It is not easy for an agreement which creates a security interest as a matter of law to miss being a security agreement. Under *Mitchell*, the agreement herein is full of " 'language ... which "leads to the logical conclusion that it was the intention of the parties that a security interest be created" ' ". That language consists of the provisions in the agreement for payment over an unalterable term followed by transfer of title. That such language logically indicates intention to create a security interest is determined as a matter of law by 12A O.S. § 1–201(37). In terms of general contract law, one might say that a writing which is extensive enough to be interpreted as a specific type of contract as a matter of law (under § 1–201(37)) is extensive enough to be recognized as that type of contract (under § 9–203(1)(a)).

The Trustee cites *In re Fritsche*, 36 B.R. 844, 846 (B.C., D.R.I.1984). That case is distinguishable. The "leases" there in question were "ineptly drafted" and "defective on ... varied grounds" including provision of a purchase option for no specified or calculable amount, 36 B.R. pp. 845 n. 2, and 846 n. 5. For these reasons, the court specifically held that the then-effective equivalent of 12A O.S. § 1–201(37)(b)(iv) "is not applicable to the facts of this case," *id.* p. 846. It is also noteworthy that *In re Fritsche* applies Rhode Island law, and Rhode Island courts were extremely demanding of security agreements—to an extent disapproved by *Evans v. Everett*, 183 S.E.2d pp. 112–113, which itself was cited with approval in *Mitchell*. To whatever extent *In re Fritsche* is not distinguishable, it would seem to take a hypercritical approach to the formal requisites of a security agreement, which is not appropriate under *Mitchell* and is not followed by this Court.

The Trustee also cites *Bishop v. Novacek*, 41 U.C.C.R. 1813, 1985 WL 2477 (D.Minn. 1985). That case is also distinguishable. The document there in question was a "Farm Lease" dealing with growing crops, whose language was "somewhat unorthodox and ... less than clear", 41 U.C.C.R. p. 1818. The court ruled that the "lease" would be deemed a security agreement if it "objectively shows"

*and* was "actually intended to create a security interest", *id.* p. 1817. The court held that the document, for all its faults, *was* sufficient to "provide for a security interest under the objective prong of the ... test"; but the parties' actual or "subjective" intent was unclear and would require trial, *id.* p. 1818. Accordingly, cross-motions for summary judgment were denied. In other words, the document passed the statute of frauds under Minnesota's equivalent of 12A O.S. § 9–203(1)(a), but its precise nature as lease or security agreement was unclear under Minnesota's equivalent of 12A O.S. § 1–201(37), such that further inquiry was needed. To whatever extent this case is not distinguishable, it seems to oppose rather than support the Trustee's argument.

■ This Court concludes that the agreement herein is a valid and enforceable security agreement under both 12A O.S. §§ 1–201(37), 9–203(1). Although the security interest created thereby is valid and enforceable, the question remains whether it was properly perfected.

The Trustee urges this Court to apply the rule of *In re Otasco, Inc. (Wheels, Inc. v. Otasco, Inc.)*, 111 B.R. 976 (B.C., N.D.Okl. 1990) (hereinafter "*Otasco*"). In that case, the court held that, first, a "lease" of motor vehicles was actually a secured sale, and that, second, the security interest created thereby, though valid and enforceable, was not properly perfected. The court's decision on the first point was reversed, see 196 B.R. 554 (N.D.Okl.1991), thereby mooting the second point. For present purposes, this Court adopts and incorporates by reference *Otasco's* discussion of the second point; see *Otasco*, 111 B.R. pp. 984–995.

However, *Otasco* is distinguishable. In that case, perfection was governed by the Oklahoma Motor Vehicle License and Registration Act, part of Title 47 O.S. The secured creditor, Wheels Inc., made no attempt to perfect by the exclusive method prescribed by that Act, i.e. by delivering a lien entry form to an agent of the Oklahoma Tax Commission. The alleged "perfection" consisted of entries on certificates of title which

    misname the secured party as the "owner",
    do not contain the real owner's name or

address at all, and do not disclose the existence, let alone the date, of any security agreement[,]

so that the owner-debtor's identity could not even be guessed without "extrinsic evidence (i.e., prior knowledge that the vehicles [we]re in Otasco's hands)", *id.* p. 992. The applicability of 12A O.S. § 9–402(8) of the Commercial Code was questionable, 111 B.R. pp. 990–991; but to the extent it did apply, the court held that it did not excuse such drastic non-compliance with the perfection requirements of the Motor Vehicle License and Registration Act, *id.* p. 993. Since *neither* a financing statement nor a lien entry form (however incorrect or irregular) had been filed, and since the certificates of title named Wheels Inc. as "owner" without any hint of the involvement of Otasco *in any capacity,* there was no discussion of 12A O.S. § 9–408. In the present case, the correct type of document (i.e. a financing statement) was actually filed; those documents name both of the appropriate parties, and correctly designate them as "Debtor" and "Secured Party" respectively; and 12A O.S. § 9–408 does apply.

12A O.S. § 9–408 provides in pertinent part as follows:

> A ... lessor of goods may file a financing statement using the terms ... "lessor", "lessee" or the like instead of the terms specified in Section 9–402. The provisions of this part shall apply as appropriate to such a financing statement but its filing shall not of itself be a factor in determining whether or not the ... lease is intended as security (Section 1–201(37)). However, if it is determined for other reasons that the ... lease is so intended, a security interest of the ... lessor which attaches to the ... leased goods is perfected by such filing.

The financing statements filed herein do not use the terms "lessor" or "lessee", but correctly identify the parties as "Debtor" and "Secured Party". To this extent, these financing statements are regular on their face, even without resort to the saving provisions of § 9–408. However, these financing statements do recite that "This is a lease and not a security agreement". Since § 9–408 permits the use of "the terms ... 'lessor', 'les-see' *or the like* " (emphasis added), it appears to this Court that it permits reference to an alleged "lease" as well as to an alleged "lessor" and "lessee".

This Court concludes that the financing statements herein are sufficient to perfect Northfield's security interest, pursuant to 12A O.S. § 9–408.

■ This Court has elsewhere held that Judge Cornish did not intend to authorize payment of the proceeds from the sale of Southern Star's assets to any creditors not otherwise entitled to them. See *In re Southern Star Foods, Inc.,* supra, 190 B.R. p. 422. But Northfield, as a creditor with a perfected security interest in the equipment, was entitled to receive the proceeds from the sale of its collateral, 12A O.S. § 9–306, 11 U.S.C. § 552(b)(1). Since Northfield was entitled to be paid, Northfield need not repay anything.

Accordingly, the Trustee shall take nothing on his complaint, and the same shall be dismissed on its merits. Each party shall bear its own costs. Judgment shall be entered in conformity herewith. The Court will prepare and execute its own form of judgment.

AND IT IS SO ORDERED.