In re Beverly A. STRAIGHT, d/b/a Centerline Traffic Control & Flagging, and Milton L. Straight, a/k/a Milton Lloyd Straight, Milton Straight, Mickie Straight, Debtors.

**WYOMING DEPARTMENT OF TRANSPORTATION,**
Appellants,

v.

Beverly A. STRAIGHT and Milton Lloyd Straight, Appellees.

Bankruptcy No. 95–10007.
Adversary No. 96–CV–0184–J.

United States District Court,
D. Wyoming.

May 15, 1997.

Lawrence A. Bobbitt, Senior Assistant Attorney General, Wyoming Attorney General, Cheyenne, WY, for appellant.

Stephen R. Winship, Winship & Associates, Casper, WY, for appellees.

## ORDER GRANTING IN PART AND DENYING IN PART APPELLEES' MOTION TO DISMISS APPEAL

### and

## OPINION AND ORDER ON BANKRUPTCY APPEAL, AFFIRMING BANKRUPTCY COURT

ALAN B. JOHNSON, Chief Judge.

The Appellees' Motion to Dismiss Appeal and the Appellant's response thereto, as well as the Appellant's bankruptcy appeal, came before the Court for hearing on November 7, 1996. Counsel for the parties appeared and presented arguments in support of their respective positions on all outstanding issues, including the substance of the instant bankruptcy appeal. This Court has reviewed the record on appeal, the pleadings of record and the briefs of appellants and appellees, and is fully advised in the premises. For the following reasons, the Court finds that the Appellee's Motion to Dismiss Appeal should be GRANTED, insofar as the motion seeks dismissal of issues relating to the adequacy of notice and seeks to challenge the contempt citation issued by the bankruptcy court September 20, 1995, and DENIED, to the extent that the motion seeks dismissal of issues relating to the Order Approving Payment of Fees and Costs entered by the United States Bankruptcy Court for the District of Wyo-

ming on July 11, 1996. The Court further finds that the bankruptcy court's order granting fees and costs in favor should be AFFIRMED, in favor of appellees.

### Background

The debtors, Beverly A. Straight, d/b/a Centerline Traffic Control & Flagging, and Milton L. Straight, filed for relief under Chapter 13 of the Bankruptcy Code on January 13, 1995. Ms. Straight is a highway flagging contractor certified by the State of Wyoming as a "Disadvantaged Business Enterprise" (DBE) under guidelines of the Federal Highway Administration for funding of highway construction projects. Most of Ms. Straight's income was derived from work done as a subcontractor on federal highway projects. In 1994, a general contractor did not pay Straight or other subcontractors for work done on a highway construction project. Consequently, Straight was compelled to seek bankruptcy protection. Two agencies of the State of Wyoming filed proofs of claim in the Chapter 13 bankruptcy proceeding. Wyoming Worker's Safety and Compensation filed a claim on March 28, 1995 in the amount of $27,597.42 for unpaid workers' compensation premiums. The Wyoming Department of Employment filed a claim for $2,474.88 for unpaid unemployment taxes and interest.

On February 10, 1995, after the debtors' Chapter 13 petition had been filed, the Department of Transportation gave notice to Straight of its intent to decertify Straight's DBE status. The letter states:

We have just received copies of papers filed by Beverly Ann Straight in the United States Bankruptcy Court for the District of Wyoming January 13, 1995.

49 CFR 23.45(f)3(iv) require[s] Wyoming Department of Transportation to "analyze the bonding and financial capacity of the firm" for eligibility in the DBE program. DBE Definition 1.A(b) states a "disadvantaged business" means a small business concern is one "whose management and daily business operation are controlled by one or more of the socially and economically disadvantaged individuals who own it."

It is apparent that you have lost the ability to control the financial capacity of this

firm. By filing for Chapter 13 bankruptcy, you have also lost the ability to control your business; that control now lies in the hands of the Bankruptcy Court and the Bankruptcy Trustee.

Therefore, in accordance with the 1994 Wyoming Department of Transportation Disadvantaged Business Enterprise Plan, Section Ten—Decertification, you are hereby notified of our intent to decertify. You have 14 calendar days from receipt of this letter to show cause why your firm should not be decertified.

If you have any further questions, please feel free to contact this office.

The letter was signed by Leroy T. Wells, P.E., DBE Liaison Officer for the Department of Transportation. The agency's letterhead gave as its address: The Department of Transportation, 5300 Bishop Boulevard (82009), P.O. Box 1708, Cheyenne, Wyoming 82003–1708. R.O.A., Vol. 1, at 80.

The attorney for the debtor responded to the department by letter dated March 14, 1995. The letter discussed Chapter 13 bankruptcy relief, and also noted that 11 U.S.C. § 525(a) prohibits any "discrimination based on a bankruptcy filing including the denial, revocation, suspension or refusal to renew a license, permit, chapter, franchise or other similar grant because that person has filed for protection under the Bankruptcy Code." R.O.A., Vol. 1 at 80–81.

Counsel for the Department of Transportation, Mr. Bobbitt with the Wyoming Office of the Attorney General, responded to the letter on March 24, 1995. The letter indicates that "no action is being taken against your client solely because of her bankruptcy action. No claim is being made against the estate, and, no change is being made to existing contracts or to funds related thereto." The letter continues:

Federal regulations as set forth in 49 CFR 23.45(f)(3)(iv) require WYDOT to determine whether a firm is an "eligible disadvantaged business enterprise." In making such a determination, WYDOT **shall**, "Analyze the bonding and financial capacity of the firm." WYDOT is proceeding against Centerline based upon consideration of the future responsibility of the company. This determination is made with respect to all DBE contractors, whether or not they have sought bankruptcy protection. In other words, WYDOT is concerned with the future financial responsibility of the debtor, not with the discharge of her debts, etc. under the bankruptcy code.

It is our understanding that the bankruptcy code was not intended to be a shield for debtors from reasonable inquiries about their ability to manage financial matters, particularly where their ability to do so is related to their fitness to continue as a DBE. The actions initiated by WYDOT serve a legitimate statutory purpose, the[y] protect the public funds involved in highway contracts. They are not due to any bankruptcy proceeding.

\*       \*       \*       \*       \*       \*

R.O.A., Vol. 1 at 84–85.

On March 28, 1995, the DOT did decertify Centerline as a DBE. The debtors filed their motion to show cause, and for a contempt citation on July 25, 1995. The debtor sought a determination that the State of Wyoming be adjudged in contempt for violating the automatic stay imposed pursuant to 11 U.S.C. § 362 and for violation of the bankruptcy code's protections against discriminatory treatment, as set forth in 11 U.S.C. § 525. The debtors also sought damages resulting from the decertification of the debtor's DBE status. R.O.A., Vol. 1 at 77. This motion was served upon the Wyoming Department of Transportation, P.O. Box 1708, Cheyenne, WY 82003–1708. It does not appear that a copy was sent to the Attorney General's Office. No appearance or proof of claim had been filed by the Attorney General's Office or any other representative of the State of Wyoming's Department of Transportation.

The bankruptcy court entered its order to show cause and setting hearing on the motion on July 31, 1995. That order provided:

... that a representative of the Wyoming Department of Transportation appear before this Court on the 15th day of August, 1995 at the hour of 8:30 a.m. at the Federal Courthouse, First Floor Courtroom,

First and Wolcott, Casper, Wyoming and show the Court why it should not be adjudged in contempt of this Court for its violation of the automatic stay and the anti-discrimination provisions of the Bankruptcy Code, why the Debtors' certification under the Disadvantaged Business Enterprise Program as approved by the Federal Highway Administration should not be restored and why it should not have to pay damages resulting from its improper revocation of Debtors' Disadvantaged Business Enterprise certification.

The Department of Transportation did not file a response to the motion prior to the hearing held August 15, 1995. Additionally, neither DOT or its counsel appeared at the hearing held on August 15, 1995. However, later on August 15, 1995, after the bankruptcy court's Order on Motion For Contempt Citation had been signed, counsel for the Wyoming DOT filed its "Motion to Strike Demand for Damages and Otherwise Dismiss Order to Show Cause and/or Contempt Citation and Requesting Hearing." In that motion, the DOT stated, in part:

> 1. The Disadvantaged Business Enterprise (DBE) certification held by Debtor in the name of Centerline Traffic Control and Flagging was not revoked because of the Debtor's filing of a petition under the Bankruptcy Code but because the company was not financially responsible enough to be able to be bonded by any reputable bonding company in that Debtor admits to owing $90,316.00 in accrued payroll taxes. Such bonds are required by the primary contractors seeking to use Centerline, and not by Respondent[.]

R.O.A., Vol. 1 at 73–74.

The Bankruptcy Court entered its "Order on Motion for Contempt Citation" on September 20, 1995. In that order, the bankruptcy court made the following findings:

> 1. On January 13, 1995, Beverly Ann Straight and Milton L. Straight filed their voluntary Chapter 13 petition. Mrs. Straight is engaged in a highway flagging business called Centerline Traffic Control and Flagging (Centerline). The DOT received notice of the bankruptcy filing.

> 2. On February 15, 1995, the DOT issued Mrs. Straight's business a Disadvantaged Business Enterprise (DBE) certification. This was a recertification that entitled Mrs. Straight to bid for subcontracting jobs on state highway · projects which are federally funded, and for which the prime contractor obtains financial incentives by hiring the DBE certified business owner. The federal certification process is conducted through the DOT, which also lets the construction bids.

> 3. In a March 10, 1995 letter, a DOT officer stated his intention to decertify Centerline as a DBE because Mrs. Straight had filed a chapter 13 bankruptcy and "lost the ability to control (her) business; that control now lies in the hands of the Bankruptcy Court and the Bankruptcy Trustee." This erroneous statement of the law by the DOT officer demonstrates a complete misunderstanding of the chapter 13 process.

> 4. On March 28, 1995, despite communications from Mr. Winship, the DOT did decertify Centerline. The reason given at that time was that Mrs. Straight was not operating an independent business because she did not "possess the financial and bonding resources necessary to operate the business in its field of work." However, Mrs. Straight did provide evidence of bonding through Western States Bonding. This fact was acknowledged, but rejected as determinative, by the DOT officer in a May 15, 1995 letter.

> 5. In the meantime, and due to the loss of the DBE status, Mrs. Straight lost at least two (2) separate construction contracts for summer, 1995 work.

> 6. The DOT is a governmental unit. The moment the DOT officer sent the March 10, 1995 letter, the DOT was in clear violation of the anti-discrimination provisions of 11 U.S.C. § 525(a). *In re Exquisito Services, Inc.*, 823 F.2d 151, 155 (5th Cir.1987). Section 525 prohibits a governmental unit from revoking or suspending a license, permit, or similar grant of a person solely because that person is a debtor under the Bankruptcy Code. And following Mr. Winship's letter of March 14,

1995, specifically informing the DOT of § 525, the DOT proceeded to decertify Centerline anyway.

7. The debtor's testimony, the tenor of the DOT letters, and the apparent intransigence of the DOT officer convince the court that the subsequently stated reasons for revoking the DBE certificate were merely pretext and an attempt to excuse actions clearly wrongful under § 525. The DOT has failed to provide any non-bankruptcy related justification for its action, particularly after Mrs. Straight provided a surety bond and additional financial information as requested.

8. The DOT officer's actions were also a violation of the automatic stay imposed by § 362(a)(3). That section prohibits any act to exercise control over property of the estate without first obtaining appropriate relief from the bankruptcy court. The DBE certification is a financial interest which provides a pecuniary advantage to the debtor and as such, is property of the bankruptcy estate. 11 U.S.C. § 541(a) (1); *In re Metro Transp. Co.*, 64 B.R. 968, 973 (Bankr.E.D.Pa.1986) (PUC taxi cab certificates to operate are part of debtor's estate); *In re St. Louis South Park II, Inc.*, 111 B.R. 260 (Bankr.W.D.Mo.1990) (nursing home certificate of need protected by automatic stay).

9. There is an exception for certain governmental action, which is found in § 362(b)(4). That section excepts actions by a governmental unit to enforce that entity's police or regulatory power. In the Tenth Circuit, the two (2) tests used to determine whether the § 362(b)(4) exception applies are found in *Eddleman v. U.S. Dept. of Labor*, 923 F.2d 782, 790–791 (10th Cir.1991). Under the "pecuniary purpose test," the DOT action might be excepted because the state government has no pecuniary interest in Centerline's DBE status.

10. The "public policy" test distinguishes between governmental proceedings aimed at effectuating public policy and those aimed at adjudicating private rights. *Id.* In the case of *In re Medicar Ambulance Co. Inc.*, 166 B.R. 918 (Bankr. N.D.Ca.1994), the court elaborated on the public policy test, stressing the distinctions. A court should determine whether the action is an attempt to prevent future violations of the law, which falls under the public policy exception, or an attempt to determine the liability of private parties. In a thorough discussion, that court held that the suspension of Medicare payments by the United States Department of Health and Human Services was a violation of the automatic stay.

11. In this case, the DOT was not promoting the public safety when it interfered with Beverly Ann Straight's ability to continue her business. One of the stated reasons for revoking the DBE status was that the debtors owed accrued payroll taxes in excess of $90,000. Clearly, the DOT action was based on pecuniary considerations, rather than public policy matters. *Bd. of County Comm'rs of County of Archuleta v. Fairfield Communities, Inc.*, 122 B.R. 128 (D.Colo.1990). This action was willful and is precisely the type of action that the automatic stay is intended to prevent. *In re Christensen*, 167 B.R. 213, 217 (D.Or. 1994); *In re Kuck*, 116 B.R. 821 (Bankr. S.D.Ala.1990).

12. The law is well-settled that a violation of the automatic stay is void *ab initio*. *In re Calder*, 907 F.2d 953, 956 (10th Cir. 1990). This court has the power to reinstate the debtor's DBE status or declare it unaffected by the decertification. *In re Exquisito Services*, 823 F.2d at 155.

13. Under § 105 and § 362(h), the court also has the authority to award costs and attorney fees to the debtor for willful violations of the automatic stay. Compensatory damages are also contemplated and are not barred by assertions of Eleventh Amendment sovereign immunity. 11 U.S.C. § 106(a)(3) (1994).

R.O.A., Vol. 1 at 68.

Subsequently, the DOT filed a "Motion for a New Trial," seeking to set aside the Court's Order on Motion for Contempt Citation and a new trial. It asserted a denial of due process in that it did not receive notice of the hearing, offering in support of the motion various affidavits of state employees. The motion also stated, in part:

2. WYDOT did not violate 11 U.S.C. § 525(a) because it did not suspend Debtor's Certification based on the Chapter 13 filing. WYDOT suspended Debtor based on the revocation of Debtor's bonding and on the amount of unpaid payroll liability owed by Debtor....

3. WYDOT as an agency of the State of Wyoming has sovereign immunity barring the Court from awarding attorney fees. Further, monetary damages are not recoverable against a state for violation of the automatic stay....

R.O.A., Vol. 1 at 50.

The debtor objected to the motion. R.O.A., Vol. 1 at 47. The bankruptcy court then held a hearing and, following the hearing, determined that the DOT's Motion for a New Trial should be denied. The bankruptcy court fully considered the due process and notice issues that had been raised by the DOT. The bankruptcy court noted that the DOT's "internal mail distribution is not efficient." R.O.A., Vol. 1 at 43. That court also considered DOT's argument that its counsel should have been given notice of the hearing, even though no appearance had been entered at the time. The bankruptcy court rejected the DOT's arguments, and determined that:

> When a state or agency is sued, service is made as prescribed by the law of the state. Rule 4(d)(5) of the Wyoming Rules of Civil Procedure requires service on an agency of the state to the agency's chief executive officer, its secretary, clerk, person in charge of its principal office or place of business, or any member of its governing body. Delivery by mail to the DOT's principal place of business satisfied the notice requirements of Rule 4. The Wyoming Rules do not require notice to the Attorney General.

R.O.A., Vol. 1 at 46.

The DOT appealed this Order on December 6, 1995. R.O.A., Vol. 1 at 39. On May 14, 1996, an "Order Dismissing Appeal" was entered, dismissing the appeal upon motion of the State of Wyoming.

Then, after considering the Amended Statement of Fees and Costs filed by the debtors' attorney, the bankruptcy court entered the "Order Approving Payment of Fees and Costs" on July 11, 1996. In it, the bankruptcy court ordered the State of Wyoming to pay the allowed fees and costs in the amount of $1,949.94 for its violation of the automatic stay. R.O.A., Vol. 1 at 31. On July 19, 1996, the Wyoming Department of Transportation filed its "Notice of Appeal Under 28 U.S.C. § 158(a) or (b) from a Final Order of the Bankruptcy Court." R.O.A., Vol. 1 at 29. It is only the bankruptcy court's decision to award fees and costs for violation of the automatic stay that is properly before this Court in the instant appeal.

In this appeal, the issues raised by the DOT are whether the bankruptcy court could properly award attorney's fees and costs for violation of the automatic stay. The DOT argues that Eleventh Amendment immunity precludes the bankruptcy court from awarding fees and costs against it, as it is an arm of the state entitled to such immunity. Necessarily, this requires the Court to attempt to engage in an analysis of *Seminole Tribe of Florida v. Florida*, — U.S. —, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), the most recent pronouncement by the United States Supreme Court regarding Eleventh Amendment immunity.

Additionally, the DOT argues that it has not waived immunity and that the filing of proofs of claim by other state agencies, including those filed by Workers' Compensation for unpaid workers' compensation premiums and the Department of Employment for unemployment taxes, do not effectively waive immunity for the Department of Transportation, a separate state agency. The debtors have argued to the contrary and assert that the filing of a proof of claim by one state agency serves as a waiver of Eleventh Amendment immunity for all state agencies.

**Discussion**

1. Notice and due process

■ These matters have not been timely appealed. Additionally, the State dismissed its appeal of the bankruptcy court's "Order on Motion for Contempt Citation" finding the DOT to be in violation of the automatic stay. R.O.A., Vol. 1 at 32. Rule 8002 of the Federal Rules of Bankruptcy Procedure provides

that an appeal from a final judgment, order, or decree shall be taken by filing a notice of appeal within 10 days of the date of the entry of the judgment, order, or decree appealed from. The state did timely appeal the Order on Motion for Contempt Citation; that appeal was dismissed. When it raised issues relating to the propriety of that order in the instant appeal, it attempted to appeal something that has already been dismissed upon the State's own motion. It cannot now resurrect that appeal, and any attempt to do so is not timely.

Notwithstanding that finding, the Court agrees with the bankruptcy court's comments in its "Order on Motion for New Trial," R.O.A., Vol. 1 at 41, that the DOT's internal system for handling of mail is not efficient. Furthermore, at the hearing held before this Court, counsel admitted that the address used by the DOT was P.O. Box 1708. That is where the notice of the hearing went; that is where the notice was received.

While the debtor's counsel failure to serve counsel for the DOT at the Attorney General's office may in fact raise ethical considerations, that does not change the fact that service was properly accomplished upon the agency in accordance with state law. With that said, the Court finds that the DOT's attempt to appeal issues relating to the notice it received of the hearing on the order to show cause are not timely. The debtors' Motion to Dismiss, to the extent that it seeks dismissal of an untimely appeal of the bankruptcy court's September 20, 1995 "Order on Motion for Contempt Citation" shall be GRANTED.

The Court will proceed to consider the more substantive, and troublesome, aspects of the instant appeal—issues relating to the State's Eleventh Amendment immunity and the impact of *Seminole Tribe of Florida v. Florida*, —— U.S. ——, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) on that issue.

2. Sovereign immunity

■ In *Seminole Tribe of Florida v. Florida*, —— U.S. ——, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), the United States Supreme Court considered whether Congress had the authority to abrogate states' sovereign immunity under the Indian Commerce Clause, U.S. Const., Art. I, § 8. The statute at issue was the Indian Gaming Regulatory Act, 25 U.S.C. § 2702, which provided for the operation and regulation of gaming by Indian tribes. The Seminole Tribe sued the State of Florida and its governor in 1991, asserting that Florida had refused to enter into any negotiation for inclusion of certain gaming activities in a tribal state compact in violation of the requirement of good faith negotiation set forth in 25 U.S.C. § 2710(d)(3). The State argued that the suit violated its sovereign immunity from suit in federal court. On appeal, the Eleventh Circuit held that the Eleventh Amendment barred the suit against the state, agreeing with the district court's finding that Congress, in § 2710(d)(7) did intend to abrogate the States' sovereign immunity, and agreeing with the determination that the Indian Regulatory Act had been passed pursuant to Congress' power under the Indian Commerce Clause of Article I, § 8 of the Constitution. The circuit court, disagreeing with the district court, concluded however, that Congress was without the power to abrogate a State's Eleventh Amendment immunity from suit under the Indian Commerce Clause.

Certiorari was granted by the Supreme Court to consider two specific issues:

(1) Does the Eleventh Amendment prevent Congress from authorizing suits by Indian tribes against States for prospective injunctive relief to enforce legislation enacted pursuant to the Indian Commerce Clause?; and (2) Does the doctrine of *Ex Parte Young* permit suits against a State's governor for prospective injunctive relief to enforce the good faith bargaining requirement of the Act? We answer the first question in the affirmative, the second in the negative, and we therefore affirm the Eleventh Circuit's dismissal of petitioner's suit.

*Seminole Tribe*, —— U.S. at ——, 116 S.Ct. at 1122.

The Supreme Court stated:

In order to determine whether Congress has abrogated the States' sovereign immunity, we ask two questions: first, whether

Congress has "unequivocally expresse[d] its intent to abrogate the immunity," *Green v. Mansour,* 474 U.S. 64, 68, 106 S.Ct. 423, 426, 88 L.Ed.2d 371 (1985); and second, whether Congress has acted "pursuant to a valid exercise of power." *Ibid. Seminole Tribe,* —— U.S. at ——, 116 S.Ct. at 1123.

The Supreme Court agreed that, with the enactment of § 2710(d)(7), Congress had in fact provided an "unmistakably clear" statement of its intent to abrogate. *Id.* However, the Court also concluded that the abrogation of sovereign immunity was not passed pursuant to a valid exercise of power under the Indian Commerce Clause. In making that determination, the Court stated:

> ... Was the Act in question passed pursuant to a constitutional provision granting Congress the power to abrogate? *Fitzpatrick v. Bitzer,* 427 U.S. 445, 452–456, 96 S.Ct. 2666, 2669–2671, 49 L.Ed.2d 614 (1976). Previously, in conducting that inquiry, we have found authority to abrogate under only two provisions of the Constitution. In *Fitzpatrick,* we recognized that the Fourteenth Amendment, by expanding federal power at the expense of state autonomy, had fundamentally altered the balance of state and federal power struck by the Constitution.... We noted that § 1 of the Fourteenth Amendment contained prohibitions expressly directed at the States and that § 5 of the Amendment expressly provided that "The Congress shall have the power to enforce, by appropriate legislation, the provisions of this article." ... We held that through the Fourteenth Amendment, federal power extended to intrude upon the province of the Eleventh Amendment and therefore that § 5 of the Fourteenth Amendment allowed Congress to abrogate the immunity from suit guaranteed by that Amendment.
>
> In only one other case has congressional abrogation of the States' Eleventh Amendment immunity been upheld. In *Pennsylvania v. Union Gas Co.,* 491 U.S. 1, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989), a plurality of the Court found that the Interstate Commerce Clause, Art. I, § 8, cl. 3, granted Congress the power to abrogate state sovereign immunity, stating that the power to regulate interstate commerce would be "incomplete without the authority to render States liable in damages." ... Justice White added the fifth vote necessary to the result in that case, but wrote separately in order to express that he "[did] not agree with much of [the plurality's] reasoning." ...
>
> In arguing that Congress through the Act abrogated the States' sovereign immunity, petitioner does not challenge the Eleventh Circuit's conclusion that the Act was passed pursuant to neither the Fourteenth Amendment nor the Interstate commerce Clause. Instead, accepting the lower court's conclusion that the Act was passed pursuant to Congress' power under the Indian Commerce Clause, petitioner now asks us to consider whether that clause grants congress the power to abrogate the States' sovereign immunity.

*Id.* at ——, 116 S.Ct. at 1124 (some citations omitted).

The Court then went on to review the singular *Union Gas* decision after noting that Article III federal courts are courts of limited jurisdiction, determined that *Union Gas* should be overruled. The Eleventh Amendment stands as a limitation or restriction upon the exercise of judicial power by Article III federal courts and "Article I cannot be used to circumvent the constitutional limitations placed upon federal jurisdiction." *Id.* at —— – ——, 116 S.Ct. at 1131–1132. However, it is made clear that it is undisputed that Congress has authority to abrogate Eleventh Amendment immunity in the context of statutes passed pursuant to the Fourteenth Amendment. *Id.* at ——, n. 15, 116 S.Ct. at 1131, n. 15. The *Seminole Tribe* decision gives Eleventh Amendment immunity a renewed vitality and has raised numerous questions that must be considered in the bankruptcy context.

The Court has not been able to discover any Tenth Circuit law that is precisely on point. A useful starting point, at least for Tenth Circuit precedent, is *Hensel v. Office of the Chief Administrative Hearing Officer,* 38 F.3d 505 (10th Cir.1994), which is not a bankruptcy case and pre-dates *Seminole*

548

*Tribe.* In that case basic principles regarding Eleventh Amendment immunity are reiterated. A state cannot be sued by a citizen of the state without the state's consent. Where an entity, such as a university, is an arm of the state, that entity is also entitled to Eleventh Amendment immunity from suit, unless Congress has made its intention to make the state subject to suit unmistakably clear in the language of the statute or has waived federal sovereign immunity.

Evidence of congressional intent to abrogate sovereign immunity must be both "'unequivocal and textual' ... Legislative history generally will be irrelevant to a judicial inquiry into whether Congress intended to abrogate the Eleventh Amendment." *Id.* at 508 (citations omitted). The Tenth Circuit then determined that, in enacting the Immigration Reform and Control Act, 8 U.S.C. § 1101 et seq., there was no evidence that Congress had intended to abrogate the Eleventh Amendment and further, that there was no explicit and unambiguous language waiving immunity. The Tenth Circuit stated:

> Although the determination of what constitutes an arm of the state for certain purposes is based on state substantive law, the scope of Eleventh Amendment immunity is a matter of federal law. In keeping with the holding in *Puerto Rico Aqueduct,* this court has stated that "[i]f the Eleventh Amendment applies, it confers total immunity from suit, not merely a defense to liability."... States and state agencies "retain their immunity against all suits in federal court."

*Id.* at 508 (citations and quotations omitted).

The Tenth Circuit, in *Hurd v. Pittsburg State University,* 109 F.3d 1540 (10th Cir. 1997), continued to acknowledge these principles, and considered *Seminole Tribe's* limitations on abrogation of Eleventh Amendment in the context of an ADEA suit. In response to arguments that the ADEA had been enacted by Congress pursuant to the Commerce Clause rather than the Fourteenth Amendment, the Tenth Circuit recognized that prior cases had held that the ADEA had been enacted pursuant to Congress' Commerce Clause powers. The circuit court also recognized, however, that it had never been decided in the Tenth Circuit whether, in enacting the ADEA, Congress had also acted pursuant to the Fourteenth Amendment. The circuit court stated:

> [N]othing in *Seminole Tribe* requires us to alter our implicit conclusion in *Hurd II* that the legislative history of the 1974 amendments to the ADEA reflects a purpose consistent with the Fourteenth Amendment and that Congress acted pursuant to its powers under the Fourteenth Amendment when it applied the ADEA to the states. Congress intended to and had authority to abrogate the states' Eleventh Amendment immunity from suit by the 1974 amendments to the ADEA.

109 F.3d 1540, 1544. Clearly, the Tenth Circuit has taken the position that Congress may properly exercise its powers pursuant to more than one constitutional provision and that some acts of Congress may enact legislation pursuant to multiple sources of constitutional authority.

Thus, in this era of *post-Seminole Tribe* law, what the Court must consider in this appeal is whether Congress could, in the exercise of power granted to it under the Bankruptcy Clause, waive states' sovereign immunity as to proceedings arising under specific sections of the Bankruptcy Code. The case law as it has developed reflects a split of authority, with some courts finding that Congress may validly abrogate states' sovereign immunity and other courts holding to the contrary. It also appears that of the courts finding that Congress does not have the power to abrogate Eleventh Amendment immunity under the bankruptcy clause of Article I of the Constitution, there is a renewed emphasis given to the subsequent provisions of § 106 relating to waiver of immunity. Additionally, courts have been required to consider whether Congress may have acted pursuant to the Fourteenth Amendment when it enacted certain provisions abrogating states' sovereign immunity.

Section 106 of the Bankruptcy Code, entitled "Waiver of sovereign immunity," provides:

> (a) Notwithstanding an assertion of sovereign immunity, sovereign immunity is abrogated as to a governmental unit to the

extent set forth in this section with respect to the following:

(1) Sections 105, 106, 107, 108, 303, 346, 362, 364, 365, 366, 502, 503, 505, 506, 510, 522, 523, 524, 525, 542, 543, 544, 545, 546, 547, 548, 549, 550, 551, 552, 553, 722, 724, 726, 728, 744, 749, 764, 901, 922, 926, 928, 929, 933, 1107, 1141, 1142, 1143, 1146, 1201, 1203, 1205, 1206, 1227, 1231, 1301, 1303, 1304, and 1327 of this title.

(2) The court may hear and determine any issue arising with respect to the application of such sections to governmental units.

(3) The court may issue against a governmental unit an order, process, or judgment under such sections of the Federal Rules of Bankruptcy Procedure, including an order or judgment awarding a money recovery, but not including an award of punitive damages. Such order or judgment for costs or fees under this title or the Federal Rules of Bankruptcy Procedure against any governmental unit shall be consistent with the provisions and limitations of section 2412(d)(2)(A) of title 28.

(4) The enforcement of any such order, process, or judgment against any governmental unit shall be consistent with appropriate nonbankruptcy law applicable to such governmental unit and, in the case of a money judgment against the United States, shall be paid as if it is a judgment rendered by a district court of the United States.

(5) Nothing in this section shall create any substantive claim for relief or cause of action not otherwise existing under this title, the Federal Rules of Bankruptcy Procedure, or nonbankruptcy law.

(b) A governmental unit that has filed a proof of claim in the case is deemed to have waived sovereign immunity with respect to a claim against such governmental unit that is property of the estate and that arose out of the same transaction or occurrence out of which the claim of such governmental unit arose.

(c) Notwithstanding any assertion of sovereign immunity by a governmental unit, there shall be offset against a claim or interest of a governmental unit any claim against such governmental unit that is property of the estate.

The developing case law is uniform in agreement that, under the teachings of *Seminole Tribe*, although Congress has clearly evidenced in the language of § 106 its intent to abrogate sovereign immunity under the Eleventh Amendment, Congress does not have the power to abrogate Eleventh Amendment immunity solely pursuant to its Article I bankruptcy powers.

However, this finding does not end the inquiry, as the Supreme Court made clear that when Congress acts pursuant to its enforcement powers under the Fourteenth Amendment, § 5, to enforce federal rights, sovereign Eleventh Amendment immunity may not obtain and may be abrogated pursuant to that constitutional provision. It is here that the case law begins to diverge and reach differing conclusions regarding congressional authority to abrogate sovereign immunity of the states.

Some of the cases conclude that Congress may abrogate sovereign immunity pursuant to the enforcement provisions of § 5 of the Fourteenth Amendment. It is this line of cases that this Court has elected to follow in making its decision in the instant case. A decision rendered by Chief Bankruptcy Judge Mickey Dan Wilson, in *In re Southern Star Foods, Inc.*, 190 B.R. 419 (E.D.Okla. 1995), held that Congress may abrogate a state's sovereign immunity under the Fourteenth Amendment. The decision pre-dates the *Seminole Tribe* decision, but continues to provide a useful analysis regarding this issue. In response to the state's argument that Congress lacked the power to abrogate Oklahoma's sovereign immunity, the bankruptcy court reviewed the doctrine in an historical context and against the policy considerations that undergird the evolution of the doctrine.

The analysis began with the original conceptual notion that "'the King can do no wrong.'" *Mather v. Oklahoma Employment Sec. Comm'n (In re Southern Star Foods)*, 190 B.R. at 423. That court then went on to discuss the United States Supreme Court's decision in *Chisholm v. Georgia*, 2 Dall. 419, 2 U.S. 419, 1 L.Ed. 440 (1793), in which the

Court held that the State of Georgia could be sued in federal court by a citizen of South Carolina, notwithstanding Georgia's claim of sovereign immunity. *Id.* Continuing:

> The narrow ruling of *Chisholm v. Georgia*, that a State could be sued in Federal court by a citizen of another State, was overruled by the Eleventh Amendment. In effect, an "inconvenien[ce] in practice" of the sort noted by Justice Cushing was remedied, as Justice Cushing recommended, by "a regular mode ... for amendment." The Eleventh Amendment does not purport to overrule the principle on which *Chisholm v. Georgia* was based, i.e., sovereignty of the people, embodied in their National government, and for national purposes superior to the sovereignty of the States. In 1861, a minority of disgruntled States attempted to overrule *Chisholm v. Georgia's* basic principles with armed force. Their argument was met with a stronger one. In 1868, the winning argument of the Union was formalized in the Fourteenth Amendment to the Constitution. That Amendment reads in pertinent part as follows:
>
> > Section 1.... No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protections of the laws.
> >
> > \*    \*    \*    \*    \*    \*
> >
> > Section 5. The Congress shall have power to enforce, by appropriate legislation, the provisions of this article.
>
> This Amendment is usually thought of as a response to slavery; but it can also be seen as a virtual codification of the basic principle (though not the narrow ruling) of *Chisholm v. Georgia.* The Fourteenth Amendment provides that citizens of the United States may rely upon their national Congress to enforce their national rights against the States.
>
> In short, there has been, in Hamilton's words, "a surrender of this immunity in the [Constitution]." According to the Supreme Court in *Chisholm v. Georgia*, such

"surrender occurred with the adoption of the Constitution in 1789; but if there be any doubt on that score, it certainly occurred with the ratification of the Fourteenth Amendment in 1868."

> In 1890, a different U.S. Supreme Court used the Eleventh Amendment as a vehicle for reimporting the doctrine of State sovereign immunity into our Constitutional law, *Hans v. Louisiana*, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890). Since then, *Hans v. Louisiana* has been limited, and the Fourteenth Amendment remembered and re-enforced to a considerable extent, *Fitzpatrick v. Bitzer*, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976); *Pennhurst State School and Hospital v. Halderman*, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984); *Atascadero State Hospital v. Scanlon*, 473 U.S. 234, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985). In 1987, *Hans v. Louisiana* escaped overruling by an evenly divided Court, *see Welch v. Texas Dept. of Highways and Public Transportation*, 483 U.S. 468, 107 S.Ct. 2941, 97 L.Ed.2d 389 (1987). Since then, our existing jurisprudence regarding the Eleventh Amendment and State so-called sovereign immunity has been criticized from left, right, and center.... But it remains the rule that, pursuant to Section 5 of the Fourteenth Amendment, Congress may abrogate the States' so-called sovereign immunity, notwithstanding the Eleventh Amendment, if Congress does so in clear and unequivocal statutory language....

> In its original version, 11 U.S.C. § 106 was held insufficient to abrogate sovereign immunity.... In 1994, the statute was amended. The language used by Congress in the amended, presently effective version of 11 U.S.C. § 106(a) is as clear and unequivocal an abrogation of State sovereign immunity, as against actions such as this one under 11 U.S.C. §§ 542, 549, 550, 724, as could possibly be expressed in words.

> There remains the question whether, in enacting 11 U.S.C. § 106(a) with its clear and unequivocal abrogation of State sovereign immunity, Congress acted pursuant to its enforcement powers under Section 5 of the Fourteenth Amendment. It is pro-

posed by some that the enforcement powers of the Fourteenth Amendment do not apply "to antecedent provisions of the Constitution," *Pennsylvania v. Union Gas Co.*, 491 U.S. p. 42, 109 S.Ct. p. 2303, 105 L.Ed.2d p. 34 (in concurring/dissenting opinion by Justice Scalia), such as the Commerce Clause, *id.*, or Article I's bankruptcy clause, *Hoffman v. Connecticut Income Dept.*, 492 U.S. p. 105, 109 S.Ct. p. 2825, 106 L.Ed.2d p. 86 (concurring opinion of Justice Scalia).

This could be true only if such "antecedent powers" did not implicate "the privileges or immunities of citizens of the United States ... life, liberty or property ... due process of law ... [or] the equal protections of the laws" guaranteed by the Fourteenth Amendment. But Congress' exercise of its basic national legislative powers under any of the provisions of Article I will usually (if not invariably) implicate "the privileges or immunities of citizens of the United States ... life, liberty or property ... due process of law ... [or] the equal protections of the laws." A State cannot limit the exercise by a citizen of the United States of a right conferred by a valid act of Congress.... Article I of the Constitution gives the national government power to legislate on the subject of bankruptcy; and the national government has done so, by creating the complex of privileges and immunities, rights and liabilities, found in the Bankruptcy Code. The Bankruptcy Code is intended to provide all American citizens with the following: the privilege of efficient liquidation or other use and ratable distribution of a debtor's assets, or (to put it another way) with immunity from the inefficient liquidation or use and inequitable distribution of a debtor's assets which may obtain under State laws; the privilege of discharge, or (to put it another way) with immunity from oppressive debt collection which may obtain under State laws; liberty from economic bondage, and protection against undue loss of value of property in exigent financial circumstances; and fair and efficient determination of all of the above, according to the process due in a national court of equitable jurisdiction, without regard to

persons or to any special privileges save those considered by Congress to be justified as a matter of policy.

Although such laws are enacted "pursuant to Article I," they are enforceable "through the Fourteenth Amendment." To attempt to separate the power of national enactment under Article I from the power of national enforcement under the Fourteenth Amendment is to mince the Constitution—to take what should be considered as a working whole, and dismember it into a scatter of lifeless parts. This Court declines to do so. It is apparent to this Court that 11 U.S.C. § 106(a), even though enacted "pursuant to Article I," is also a valid exercise of Congressional enforcement power, including the power to abrogate State Sovereign immunity, "through the Fourteenth Amendment."

*In Re Southern Star Foods*, 190 B.R. at 425–426 (many citations omitted).

After the *In re Southern Star Foods* case out of Oklahoma was decided, the Supreme Court rendered its decision in *Seminole Tribe*. However, the Georgia bankruptcy court, in *Headrick v. State of Georgia (In re Headrick)*, 200 B.R. 963 (Bankr.S.D.Ga.1996), revisited the *In Re Southern Star Foods* decision and elected to follow its rationale. In *Headrick*, the State of Georgia had filed a proof of claim (on April 10, 1995) for income taxes after the debtors filed for Chapter 13 relief (on December 28, 1994). On October 24, 1995, Georgia issued an "Official Assessment and Demand for Payment" against the debtors and on December 21, 1995 issued a "Collection Notice" containing demands for payment and threats of collection by levy, garnishment or attachment, against the debtors. Debtors then instituted the action against Georgia alleging that the collection attempts violated the § 362 automatic stay. In response to the State's argument that it was entitled to Eleventh Amendment immunity, the Georgia bankruptcy court stated the following:

By its express terms, the Eleventh Amendment to the United States Constitution immunizes a State from suit in the federal courts by a non-resident of that State. Despite this narrow language, the

Supreme Court has consistently interpreted the Eleventh Amendment to immunize States from suits by any individual, whether a resident of that State or of another State.... This immunity restricts Congress from creating rights of action against States in federal court under Congress' Article I powers unless the State consents to suit. *Seminole Tribe* ... (Congress cannot abrogate a State's immunity from suit by creating a right of action against the State under the Indian Commerce Clause.)

The Supreme Court established a two prong test to determine whether Congress may abrogate a State's immunity: "... first, whether Congress has unequivocally expressed its intent to abrogate the immunity, and second, whether Congress has acted pursuant to a valid exercise of power." (citations omitted) ... In *Seminole Tribe*, the Supreme Court acknowledged that Congress had unequivocally acted to abrogate State immunity from suit under the Indian Gaming Regulatory Act, 25 U.S.C. § 2701 et seq., but ruled that the Indian Commerce Clause of the Constitution ... did not authorize Congress to abrogate this immunity. In determining that the Indian Commerce Clause did not authorize Congress to subject a State to suit in federal court by an individual, the Court reversed the line of cases holding that the Commerce Clause authorizes Congress to act so....

Bankruptcy Code title 11 § 106 unequivocally expresses Congressional intent to abrogate the States' sovereign immunity by subjecting them to damage awards for violations of the automatic stay. *See, In Re Merchants Grain, Inc.*, 59 F.3d 630 (7th Cir.1995) vacated and remanded —— U.S. ——, 116 S.Ct. 1411, 134 L.Ed.2d 537, (Congress' 1994 revision of § 106 unequivocally evidenced its intent to abrogate the States' immunity from suit). The question is whether Congress has authority to abrogate this immunity under the Bankruptcy Clause of the United States Constitution (U.S. Const.Art. I, § 8, Cl.4). Answered yes by the Seventh Circuit in *Merchants Grain*, but remanded by the Supreme Court for reconsideration in light of *Seminole Tribe* ....

Under the rationale articulated in *Seminole Tribe*, Congress is not authorized to abrogate the States' immunity under the Bankruptcy Clause of the United States Constitution.... However, in *Seminole Tribe*, the Supreme Court recognized and reaffirmed Congress' ability to abrogate a State's immunity under the express language of the Fourteenth Amendment.... The Supreme Court did not address whether the Fourteenth Amendment authorized Congress to enforce the Indian Gaming Regulatory Act against the States because the petitioner abandoned this issue after the Eleventh Circuit Court of Appeals rejected its argument that the Indian Gaming Regulatory Act created a liberty and property interest subject to Congress' protection under the Fourteenth Amendment.

The Fourteenth Amendment expressly gives Congress the authority to pass laws to prevent the States from abridging citizens' privileges and immunities. *Fitzpatrick v. Bitzer*, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976).

"The protection extended to citizens of the United States by the privileges and immunities clause includes those rights and privileges which, under the laws and Constitution of the United States, are incident to citizenship of the United States, but does not include rights pertaining to state citizenship and derived solely from the relationship of the citizen and his state established by state law."

...

... Article I empowers Congress to grant debtors the privileges and immunities of the Bankruptcy Code, and the Fourteenth Amendment gives Congress the right to enforce those privileges and immunities by creating private rights of action against the States. In § 106, Congress unequivocally expressed its intent to abrogate Georgia's immunity, and this abrogation was enacted by a valid exercise of power under the Fourteenth Amendment. *See, Mather v. Oklahoma Employment Sec. Comm'n (In re Southern Star Foods, Inc.)*, 190 B.R.

419 (Bankr.E.D.Okl.1995) (Article I gives Congress the power to legislate on the subject of bankruptcy, and the Fourteenth Amendment allowed debtors to enforce the provisions of the Bankruptcy Code in federal court notwithstanding the States' Eleventh Amendment immunity.)

*Headrick,* 200 B.R. at 965–966 (most citations omitted). The *Headrick* court then went on to also find alternatively that the State of Georgia had waived its immunity by filing a proof of claim in the debtor's estate.

Georgia then sought a reconsideration of the *Headrick* decision. As a result, another opinion discussing Eleventh Amendment immunity issued out of the Georgia bankruptcy Court. *Headrick v. State of Georgia (In re Headrick),* 203 B.R. 805 (Bankr.S.D.Ga.1996). The bankruptcy persisted in its prior determination that the Fourteenth Amendment granted to Congress the authority to subject Georgia to causes of action filed by individuals to enforce the provisions of and recover damages for violation of the automatic stay. *In re Headrick,* 203 B.R. at 807.

That court again discussed the two prong test established by the Supreme Court for determining whether Congress may abrogate Eleventh Amendment immunity from suit in federal court. Of significance is the discussion whether Congress has the authority to abrogate Eleventh Amendment immunity under the Constitution of the United States. The bankruptcy court stated:

> In my previous Order, I found that the protections of the Bankruptcy Code are Congressional expression of specific privileges and immunities incident to federal citizenship, and that Congress may therefore enact legislation enforceable against the States in federal court under the Fourteenth Amendment of the United States Constitution. [footnote omitted]. *Headrick v. Georgia (In re Headrick),* 200 B.R. 963 (Bankr.S.D.Ga.1996), citing, *Fitzpatrick v. Bitzer,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976) (the Fourteenth Amendment specifically authorizes Congress to abrogate the States' Eleventh Amendment immunity.) In seeking reconsideration of this order, Georgia presents two unpersuasive arguments against this

holding: 1) that Congress did not expressly enact the Bankruptcy Code pursuant to the Fourteenth Amendment, thereby precluding its application to the Bankruptcy Reform Act of 1994; and 2) that such a holding is contrary to the Supreme Court's decision in *Seminole Tribe.*

> The first requirement for a valid abrogation of the States' immunity places upon Congress the burden of unequivocally expressing its intent to abrogate immunity in clear and unambiguous language. This first requirement does not require Congress to specify a constitutional provision as its basis. The second requirement, whether Congress has authority to abrogate, is a determination made by a court exercising the judicial power of the United States under Article III of the Constitution, not Congress nor this court. . . .

> Georgia also argues that my holding is contrary to the reasoning articulated in *Seminole Tribe,* and that failing to reverse the decision would be a de facto finding that Congress has authority to abrogate the State's immunity under any federal statute. The *Seminole Tribe* decision recognized and reaffirmed Congress' ability to abrogate a States' immunity under the Fourteenth Amendment. . . . The Supreme Court did not analyze the constitutionality of the Indian Gaming Regulations Act under the Fourteenth Amendment because the petitioner abandoned this argument after the Eleventh Circuit Court of Appeals rejected its contention that the Indian Gaming Regulations Act created a liberty and property interest subject to Congress' protection under the Fourteenth Amendment. . . . *Seminole Tribe* therefore did not address whether Congress has authority under the Fourteenth Amendment to enforce a Debtor's right, as a citizen of the United States, to monetary relief for State actions which violate the automatic stay provisions of section 362 of Title 11, the Bankruptcy Code. Furthermore, the rationale supporting Congress' abrogation of Georgia's immunity in this case does not, as Georgia asserts, allow Congress to abrogate the States' immunity under all federal statutes. The analysis

554

here is limited to the bankruptcy clause of the Constitution. The Constitution Article I Sec. 8 Clause 4 provides that Congress shall have the power: "... [t]o establish ... uniform Laws on the subject of Bankruptcies throughout the United States." In the exercise of this power Congress has enacted 11 U.S.C. § 362 and, pursuant to 11 U.S.C. § 106, has unequivocally subjected the States to the provisions of § 362, including subsection (h). The privileges and immunities provided for under the uniform laws of bankruptcy applicable throughout the United States are incidences of federal citizenship against which, under the Fourteenth Amendment, no State may make or enforce any law abridging same. Additionally, the Fourteenth Amendment empowers Congress to enforce the provisions of the Fourteenth Amendment protecting the privileges and immunity of federal citizenship by appropriate legislation. Georgia may not therefore attempt to enforce its revenue collections statutes in defiance of the § 362 stay and Congress, in a valid exercise of its power of enforcement under the Fourteenth Amendment, can abrogate Georgia's sovereign immunity against individual suits in federal court for damages arising from its breach of the § 362(a) stay brought pursuant to § 362(h).

*In re Headrick,* 203 B.R. at 808–809 (most citations omitted).

This analysis was again reiterated in a decision out of the same bankruptcy court, *Burke v. State of Georgia (In re Burke),* 203 B.R. 493 (Bankr.S.D.Ga.1996). The decision incorporates the reasoning of the *Headrick* opinion, and upheld the judgment that Georgia was not immune from suits for violations of the discharge injunction. *Id.*

The *Headrick* and *In re Southern Star Foods* determinations that Congress could, pursuant to the Fourteenth Amendment, abrogate the sovereign immunity of the States, have been cited in cases from other districts that either decline to follow that reasoning or did not consider the Fourteenth Amendment abrogation issue because it was not before the particular court for consideration. *See e.g., Norristown v. Commonwealth of*

*Pennsylvania, Department of Public Welfare (In re Sacred Heart Hospital of Norristown),* 204 B.R. 132 (E.D.Pa.1997) (deciding Congress could not, pursuant to Article I abrogate sovereign immunity, but not considering whether Congress had power to do so pursuant to Fourteenth Amendment, citing *Headrick); Sparkman v. State of Florida Department of Revenue (In re York–Hannover Developments, Inc.),* 201 B.R. 137 (Bankr.E.D.N.C.1996) (no abrogation under Article I, citing *In re Southern Star Foods* and *Headrick* for proposition that Congress was authorized to enact § 106(a) under § 5 of the Fourteenth Amendment, but stating "[h]owever, the issue of Congress' authority to abrogate States' sovereign immunity under § 5 of the Fourteenth Amendment is not before the court in this proceeding and in light of *Seminole,* the court concludes that Congress did not act within its constitutional authority when enacting § 106(a)."); *Tri–City Turf Club, Inc. v. Kentucky Racing Commission (In re Tri–City Turf Club, Inc.),* 203 B.R. 617 (Bankr.E.D.Ky.1996) (citing and criticizing *Headrick,* and stating "[w]hile proper enactments pursuant to the provisions of the Fourteenth Amendment of the Constitution may not fall under *Seminole Tribe's* axe, there must be a '... sufficiently strong logical connection between the aim of the act ... and central, obvious Fourteenth Amendment concerns.' ... The Court can find no hint that Congress had in its collective mind Fourteenth Amendment concerns when it enacted Section 106(a) of the Bankruptcy Code."); *In re NVR L.P.,* 206 B.R. 831 (Bankr.E.D.Va.1997) (rejecting entirely the notion that Congress may, pursuant to § 5 of the Fourteenth Amendment, enact legislation designed to enforce Article I bankruptcy legislation); *Ossen v. State of Connecticut, Department of Social Services (In re Charter Oak Associates),* 203 B.R. 17 (Bankr.D.Conn.1996) (Congress without authority to abrogate sovereign immunity under Article I bankruptcy provisions of the Constitution; not considering at all whether abrogation may be accomplished pursuant to the Fourteenth Amendment); *Koehler v. Iowa College Student Aid Commission (In re Koehler),* 204 B.R. 210 (Bankr.D.Minn. 1997) (no authority to abrogate sovereign

immunity under Article I; following *Seminole Tribe* and noting *Headrick* and *In re Star Foods* decisions as exceptional; finding state had voluntarily waived immunity through its affirmative conduct); *AER–Aerotron, Incorporated v. Texas Department of Transportation,* 104 F.3d 677 (4th Cir.1997) (analyzing immunity only in terms of Congress' Article I enactments, Congress lacks power to affect Eleventh Amendment immunity in the exercise of its Article I powers; noting *Seminole Tribe* affirmed Congress' power to affect state immunity in federal court through the Fourteenth Amendment; applying constitutional doctrine of Eleventh Amendment waiver); *Light v. State Bar of California (In re Light),* 87 F.3d 1320 (Table) Unpublished Disposition; Text at 1996 WL 341112 (9th Cir.1996) ("Congress's power to abrogate the States' sovereign immunity is now limited to congressional acts pursuant to § 5 of the Fourteenth Amendment" at *2; following *Seminole Tribe* to find damage and civil contempt claims against the State Bar to be barred by the Eleventh Amendment; unclear whether the circuit court considered whether § 106 of the Bankruptcy Code enacted pursuant to Congress' enforcement powers under the Fourteenth Amendment); *Schulman v. California State Water Resources Control Board (In re Lazar),* 200 B.R. 358 (Bankr.C.D.Cal.1996) (*Seminole Tribe* holding that Eleventh Amendment prevents Congress, acting pursuant to Article I powers, from subjecting unconsenting states to suit by private parties in federal court discussed; stating "trustees and debtors in possession may sue states and state agencies in state court ... with no hindrance from the Eleventh Amendment," relying on *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890), as reaffirmed in *Seminole;* considering state consent to suit through waiver by filing claim and making general appearance in support of its position as a secured creditor; and noting that Fourteenth Amendment fundamentally altered the balance of state and federal power, which can also be a means of abrogating Eleventh Amendment immunity, but "neither party before the Court contended that the Fourteenth Amendment provides the grounds for this Court's jurisdiction in this matter, and the Court perceives no such ground on its own" at p. 382).

It is evident to this Court that the issues presented in this case will ultimately require an analysis and disposition by a higher court. It is quite likely the Supreme Court will be called upon to clarify its holding in *Seminole Tribe,* insofar as it left open the possibility that Congress could abrogate Eleventh Amendment immunity by acting pursuant to the Fourteenth Amendment in these circumstances. Until there is definitive guidance from either the Tenth Circuit or the United States Supreme Court, this Court has elected to follow the analysis employed by the bankruptcy courts in *In re Southern Star Foods,* the only decision out of this circuit at any level discussing these issues that this Court was able to discover, and *Headrick,* as applied against the Tenth Circuit's position recognizing that congressional actions may be enacted pursuant to more than one constitutional source of authority. The Court now finds that Congress has the authority to abrogate States' sovereign immunity from suit by individuals for violating provisions of the Bankruptcy Code, pursuant to the Fourteenth Amendment.

2. Waiver

Even if this Court's determination that the State is not immune from suit in this case is in error, the Court finds that the State of Wyoming has waived immunity by filing proofs of claim against the debtors. This determination, however, requires an analysis of the scope of the State's waiver of immunity. Section 106(b) of the Bankruptcy Code provides that a "governmental unit that has filed a proof of claim in the case is deemed to have waived sovereign immunity with respect to a claim against such governmental unit that is property of the estate and that arose out of the same transaction or occurrence out of which the claim of such governmental unit arose." *Ossen v. State of Connecticut, Department of Social Services (In re Charter Oak),* 203 B.R. at 21. The *Charter Oak* court stated that these subsections of § 106 do not conflict with *Seminole Tribe,* and concluded they are enforceable against states filing proofs of claim. Many of

the cases that have been decided in the wake of *Seminole Tribe* have concluded that the state can waive its immunity by filing a proof of claim in a bankruptcy case, as set forth in 11 U.S.C. § 106(b). A state's consent to suit may arise by varied conduct. *Schulman v. California State Water Resources Control Board (In re Lazar),* 200 B.R. at 377. Waivers may arise from the filing of a claim in a bankruptcy case, or making a general appearance in a case, as well as in a state statute or constitutional provision. *Id.* The scope of a waiver will depend on the nature of the conduct giving rise to it. *Id.*

The filing of a claim in a bankruptcy case constitutes a limited waiver of sovereign immunity by a state. When a state file a claim, it waives its sovereign immunity with respect to any claim against it by the debtor arising from the same transaction or occurrence.

*Id.* at 377–378. *See also Ossen v. State of Connecticut, Department of Social Services (In re Charter Oak),* 203 B.R. at 21–22; *Koehler v. Iowa College Student Aid Commission (In re Koehler),* 204 B.R. at 217–220; *Burke v. State of Georgia (In re Burke),* 203 B.R. at 497–498; *Sacred Heart Hospital of Norristown v. Commonwealth of Pennsylvania, Department of Public Welfare (In re Sacred Heart Hospital of Norristown),* 204 B.R. at 140–142 (noting especially that the waiver of § 106(b) is a limited waiver of immunity); *Headrick v. State of Georgia (In re Headrick),* 203 B.R. at 809–810 and 200 B.R. at 967–969; *In re Martinez,* 196 B.R. 225, 229–230 (D.Puerto Rico 1996).

In this case, the State of Wyoming has argued that a waiver arising from the proofs of claim filed by the Workers' Compensation and the Wyoming Department of Employment cannot serve to waive immunity for another agency, the Department of Transportation. The debtors have asserted by a waiver by one agency waives immunity for all agencies of the state.

As noted in *Schulman v. California State Water Resources Control Board (In re Lazar),* 200 B.R. at 378, there is a split of authority on whether the filing of a claim by one state agency constitutes a waiver of Eleventh Amendment sovereign immunity for all other agencies. *In re Lazar, id.* (citing cases). That court did not agree with the broad view purporting to waive all state Eleventh Amendment immunity when one agency files a claim. That court stated:

The broad view fails to give sufficient weight, in the Court's view, to the "transaction or occurrence" language in § 106(b). Accordingly the Court must determine whether the trustee's claim against the Fund in this case has a logical relationship to the claim that the State of California has filed for unpaid taxes, including the tax contributions to the [California Underground Storage Tank Cleanup] Fund.

*Id.* at 378. In that case a claim was filed by the California State Board of Equalization (SBE) and the state controller for more than $44 million in unpaid taxes. An unspecified portion of that amount was for taxes payable to the Fund. No claim was filed by the State Water Resources Control Board (SWRCB). In the proceedings before the bankruptcy court, SWRCB argued that 1) the claims filed by the SDB and state controller were unrelated and the waiver that obtained by the filing of those claims did not extend to SWRCB, 2) that the waiver was not voluntary because the state was compelled to file a claim to participate in the distribution of the bankruptcy estate, and 3) § 106 as amended was unconstitutional in view of *Seminole Tribe.* The bankruptcy court rejected those arguments.

The court considered that the SBE had responsibility for collecting a number of kinds of taxes, including gasoline taxes collected to support the Fund. Part of the claims filed by SBE were explicitly designated as taxes owing under the Underground Storage Tank Maintenance Fee Law. The court also noted that the claims were not "de minimis" and held that the "statutory waiver of sovereign immunity resulting from the filing of a claim in a bankruptcy case was well known to the State of California when it filed its claims." *Id.*

That court also rejected the argument that the filing of a claim was not a voluntary waiver. This argument was rejected by the bankruptcy court, noting that the state, as a creditor, has a choice. It can ignore the

bankruptcy case or elect to file a claim in order to participate in the fruits of the bankruptcy process. *Id.* at 380.

The fact that a particular creditor finds these choices unattractive does not convert the choice into an involuntary decision: If this were so, many of the choices that people make in many different contexts of life would be "involuntary", and some people could live virtually their entire lives without making any voluntary choices at all. The Court declines to adopt such a cramped view of the voluntary character of human choices.

*Id.*[1]

The *Charter Oak* court noted that the waiver of immunity is a limited one. That court determined that the State is a single entity for these purposes and that all the publicly acting agencies of the state were a single governmental unit for purposes of Eleventh Amendment immunity under § 106(b). *In re Charter Oak,* 203 B.R. at 22. However, that court then went on to determine that the claim filed by the state and the debtor's claim did not arise out of the same transaction so as to constitute a waiver under § 106(b). *Id.*

As noted, § 106(b) provides that the proof of claim is a waiver to a claim against such governmental unit that arose out of the same transaction or occurrence. This language tracks the language of Fed. R.Civ.P. 13(a), which defines a compulsory counterclaim as a claim which "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim."

In defining the bounds of a compulsory counterclaim, the Second Circuit "generally has taken a broad view, not requiring an absolute identity of factual backgrounds ... but only a logical relationship between them.... This approach looks to the logical relationship between the claim and the

counterclaim and attempts to determine whether the essential facts of the various claims are so logically connected that considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit." *United States v. Aquavella,* 615 F.2d 12, 22 (2d Cir.1979) (internal citations and quotation marks omitted).

Applying this standard to the stipulation of facts submitted by the parties, the court concludes that the defendant's claim for use taxes due from the debtor is not so logically connected with the plaintiff's claim for reimbursement of services rendered the defendant that both issues would have to be resolved in one lawsuit.

*Id.* at 23. *Accord Koehler v. Iowa College Student Aid Commission (In re Koehler),* 204 B.R. at 217–222 (discussing the "logical relationship" test employed by the Eighth Circuit, and concluding that the debtor's claim for damages for violation of the discharge injunction and violations of the automatic stay when the ICSAC attempted to collect loans, for which no proof of claim was filed but which was the subject of a counterclaim against the debtor in the adversary proceedings, arose out of the same transaction and were logically related so as to satisfy the waiver of 106(b)).

Thus, given that § 106(b)'s waiver of immunity is limited, this Court believes that the critical determination will not be whether the filing of a proof of claim by one agency waives for all state agencies, but whether the activities of the state agencies are so logically related that they may be considered to have arisen out of the same transaction or occurrence, within the meaning of 11 U.S.C. § 106(b). This requires the Court to examine and consider the facts that are in the record on this appeal.

Here, it is clear that "but-for" the debtor's bankruptcy and the claims of the State for unpaid taxes by Centerline Flagging, the

---

1. This analysis collides with that of the bankruptcy court in *In re NVR L.P.,* 206 B.R. 831, 839 (Bankr.E.D.Va.1997), which held that only a state may waive its sovereign immunity and that Congress could not, through § 106(b) dictate the circumstances in which states would "waive" their Eleventh Amendment immunity, and declining to follow the opinion in *Ossen v. Connect-*

*icut Department of Social Services (In re Charter Oak).* The *NVR* court found therefore there had been no waiver of immunity by the States of Pennsylvania and Maryland, as well as finding that Congress was without authority to abrogate sovereign immunity under Article I or the Fourteenth Amendment.

DOT would not have taken steps to decertify the debtor's DBE status. There is a logical relation between the claims. The taxing entities of the State of Wyoming filed proof of claims. To the extent that the claims involving the DOT arise out of the same transaction or occurrence, the Court concludes that the State of Wyoming has waived its Eleventh Amendment immunity, acknowledging that this is a limited waiver of sovereign immunity by the State of Wyoming. Furthermore, the damages caused by the governmental unit's violation of the bankruptcy stay may be offset against the proofs of claim filed by the State of Wyoming for unpaid taxes. 11 U.S.C. § 106(c).

The Court acknowledges that the contours of Eleventh Amendment immunity have become somewhat obscured, after the Supreme Court's *Seminole Tribe* decision. However, the Court believes the instant decision does not violate public policy of the State of Wyoming and serves to facilitate the Bankruptcy Code's goal of a "fresh start" for financially troubled debtors. This is particularly true in the Chapter 13 context where the debtor's efforts to rehabilitate financially may depend upon the continued ability to generate income sufficient to pay allowed claims under a confirmed Chapter 13 plan. Here, the State seeks to have it both ways: it seeks immunity for all issues arising out of its attempt to decertify the debtor's DBE status under applicable law governing federal highway programs, yet it seeks to waive immunity so as to assert claims and participate in the bankruptcy Chapter 13 reorganization process seeking to collect the unpaid taxes that initially served as the impetus for decertifying the debtor. This belies the "logical relationship" test and the Court finds that the State of Wyoming has waived its immunity with respect to these issues and claims.

Accordingly, and for the foregoing reasons, it is therefore

**ORDERED** that the debtors' Motion to Dismiss shall be **GRANTED**, to the extent that it seeks a determination that the State has not timely appealed the bankruptcy court's September 20, 1995 "Order on Motion for Contempt Citation," and **DENIED**, to the extent that it seeks a dismissal of all issues

relating to the bankruptcy court's July 19, 1996 "Order Approving Payment of Fees and Costs." It is further

**ORDERED** that the bankruptcy court's July 19, 1996 "Order Approving Payment of Fees and Costs" shall be, and is, **AFFIRMED**.