**In the Matter of Tom & Laurie SNYDER, Debtor.**

**Tom W. Snyder, Plaintiff,**

v.

**State of Nebraska, Board of Regents University of Nebraska/Omaha, U.S. Department of Education, and Great Lakes Higher Education Corp., Defendant.**

**Bankruptcy No. BK97–82188.
Adversary No. A98–8012.**

United States Bankruptcy Court,
D. Nebraska.

Oct. 20, 1998.

Lloyd J. Blaney, Madison, WI, for Great Lakes Higher Education Corp.

Laurie M. Barrett, Omaha, NE, for U.S. Department of Education.

John C. Wiltse, University of Nebraska, Lincoln, NE, for University of Nebraska/Omaha.

Casey J. Quinn, Omaha, NE, for Tom W. Snyder.

## MEMORANDUM

TIMOTHY J. MAHONEY, Chief Judge.

This matter is before the undersigned on a Motion to Dismiss filed by Board of Regents of the University of Nebraska. Appearances: John Wiltse for the defendant/movant, Board of Regents and Casey Quinn for the plaintiff/debtor. This memorandum contains findings of fact and conclusions of law required by Fed. Bankr.R. 7052 and Fed. R.Civ.P. 52. This is a core proceeding as defined by 28 U.S.C. § 157(b)(2)(A) and (I).

Tom Snyder, one of the debtors, seeks a determination of dischargeability pursuant to 11 U.S.C. § 523(a)(8)(B) of a student loan debt insured by the United States Department of Education (Department of Education). He asserts a need for a "hardship discharge" of the loan obligation. One defendant, the United States of America, on behalf of the United States Department of Education, as ultimate guarantor of the loans, agreed to be bound by any determination of this court in the matter and requested that it be dismissed as a party. The United States asserted that the remaining defendants were fully empowered to represent the Department of Education's interest in such loans by virtue of 20 U.S.C. 1078(c)(2), 34 CFR 682.402(g)(1); and 20 U.S.C. 1087cc(a), 34 CFR 674.46. Based upon its representation that the other defendants were fully empowered to represent the interest of the United States by virtue of specific statutes and regulations, the request for dismissal was granted.

The Board of Regents of the University of Nebraska, as an agency or department of the State of Nebraska, likewise seeks to be dismissed from the action, claiming that this court lacks jurisdiction to hear debtor's complaint because of the immunity granted states by the Eleventh Amendment to the United States Constitution. In response, debtor asserts that the Board of Regents waived its 11th Amendment immunity by voluntarily participating in the National Direct Student Loan Program under the Higher Education Act. Debtor also asserts that the action is permitted by 11 U.S.C. § 106(a)(1) and (2). The Board of Regents' status as an agency of the State of Nebraska is undisputed. Hereafter, the Board of Regents shall, generally, be referred to as the "State."

### Discussion

A. *11 U.S.C. § 106(a).*

The Eleventh Amendment confers immunity from suit in federal court on states, and on agencies considered an arm of a state,

when sued by a citizen of that state.[1] *Puerto Rico Aqueduct and Sewer Auth. v. Metcalf & Eddy, Inc.,* 506 U.S. 139, 144, 113 S.Ct. 684, 687–88, 121 L.Ed.2d 605 (1993). Although Congress can abrogate the sovereign immunity of the states under the Eleventh Amendment, it can only do so where it (1) expresses an unequivocal intent to do so, and (2) acts pursuant to a valid exercise of power. *Green v. Mansour,* 474 U.S. 64, 68, 106 S.Ct. 423, 425–26, 88 L.Ed.2d 371 (1985). While congressional legislation can easily meet the first prong of this test by explicitly stating its intent, the second prong is more difficult to meet.

In *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), the Supreme Court considered the Indian Gaming Regulatory Act, 25 U.S.C. § 2701 et seq. (1988), and concluded that, although Congress clearly intended to abrogate the states' sovereign immunity by forcing state compliance with the Act in federal court, the Act was not a valid exercise of congressional power. The Court stated that, despite Congress' lawmaking authority, "[t]he Eleventh Amendment restricts the judicial power under Article III, and Article I cannot be used to circumvent the constitutional limitations placed upon federal jurisdiction." *Seminole,* 517 U.S. at 72–73, 116 S.Ct. 1114. In fact, Section 5 of the Fourteenth Amendment is currently the only constitutional provision which the Court has recognized as a source of power for legislation intended to abrogate state sovereign immunity. Although legislation enacted under Section 5 may abrogate state sovereign immunity, the legislation must be designed to enforce rights already existing under the Fourteenth Amendment. *City of Boerne v. P.F. Flores,* 521 U.S. 507, 117 S.Ct. 2157, 2164, 138 L.Ed.2d 624 (1997). Section 5 of the Fourteenth Amendment does not create new substantive rights. *Id.*

In light of *Seminole,* the debtor's assertion that the State's sovereign immunity is abrogated by 11 U.S.C. § 106(a) must be viewed as incorrect. Section 106(a) provides in part:

(a) Notwithstanding an assertion of sovereign immunity, sovereign immunity is abrogated as to a governmental unit to the extent set forth in this section with respect to the following:

(1) Sections 105, 106, 107, 108, 303, 346, 362, 363, 364, 365, 366, 502, 503, 505, 506, 510, 522, 523, 524, 525, 542, 543, 544, 545, 546, 547, 548, 549, 550, 551, 552, 553, 722, 724, 726, 728, 744, 749, 764, 901, 922, 926, 928, 929, 944, 1107, 1141, 1142, 1143, 1146, 1201, 1203, 1205, 1206, 1227, 1231, 1301, 1303, 1305, and 1327 of this title.

(2) The court may hear and determine any issue arising with respect to the application of such sections to governmental units.

This adversary proceeding is brought pursuant to 11 U.S.C. § 523(a)(8), which is included in the text of Sections 106(a). As is readily apparent, Section 106(a) is unequivocally intended to abrogate the states' sovereign immunity. The subsection was even amended in 1994 to expressly include the term "abrogate." Section 106 thus meets the first prong of the test articulated in *Green.*

▬ Like the Indian Gaming Regulatory Act considered in *Seminole,* though, Section 106 fails the second prong of the test. Nothing in the Bankruptcy Code or the legislative history leading to its enactment indicates which provision of the Constitution Congress utilized to create the Code. It seems most likely that the Bankruptcy Code was enacted pursuant to Article I, § 8, of the Constitution, which provides that Congress has the power to establish "uniform Laws on the subject of Bankruptcies throughout the United States." If that provision is the power source Congress relied on to enact bankruptcy legislation, the legislation falls directly

---

1. The text of the Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend XI. Even though the text makes no reference to citizens of the same state, in *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890), the Supreme Court concluded that a state's Eleventh Amendment immunity from suit in federal court extends to suits against a state by its own citizens.

within the purview of the *Seminole* decision. A handful of courts have attempted to preserve the constitutionality of Section 106(a) by locating its power source within the Fourteenth Amendment.[2] However, those decisions do not acknowledge the teachings of *Seminole*. Bankruptcy is not a privilege or immunity protected by the Constitution. *In re Sacred Heart Hosp. of Norristown*, 133 F.3d 237, 244 (3rd Cir.1998). There is no constitutional right to a bankruptcy discharge. See *United States v. Kras*, 409 U.S. 434, 446, 93 S.Ct. 631, 638, 34 L.Ed.2d 626 (1973).

Since Section 106(a) of the Bankruptcy Code is not enacted pursuant to Section 5 of the Fourteenth Amendment, the State is correct that Section 106(a) represents an unconstitutional abrogation of its sovereign immunity.

**B.** *Participation in the National Direct Student Loan Program*

■ The mere fact that a state participates in a program through which the federal government provides assistance for the operation by the state of a system of public aid is not sufficient to establish consent on the part of the state to be sued in the federal courts. *Edelman v. Jordan*, 415 U.S. 651, 673, 94 S.Ct. 1347, 1361, 39 L.Ed.2d 662 (1974). Congress may legitimately enact legislation pursuant to the "spending power" granted Congress in the Constitution whereby states agree to comply with federally imposed conditions (and agree to suit in federal court) in return for federal funds. However, the legitimacy of Congress' power to legislate in this manner rests on whether the State voluntarily and knowingly accepts the terms of the "contract." *Pennhurst State Sch. and Hosp. v. Halderman*, 451 U.S. 1, 17, 101 S.Ct. 1531, 1540, 67 L.Ed.2d 694 (1981). For such a relinquishment of Eleventh Amendment immunity to be binding, there must be an unequivocal indication that the state intends to consent to federal jurisdiction that otherwise would be barred by the Eleventh Amendment. *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 238, 105 S.Ct. 3142, 3145, 87 L.Ed.2d 171 (1985).

Participation in the National Direct Student Loan Program amounted to a waiver of Nebraska's Eleventh Amendment immunity only if the State voluntarily and knowingly entered into the agreement, as required by *Pennhurst*, and if the waiver of immunity was accomplished by someone to whom that power was granted under Nebraska state law. *Ford Motor Co. v. Department of Treasury*, 323 U.S. 459, 467, 65 S.Ct. 347, 352, 89 L.Ed. 389 (1945).

Relevant to this case, the chief executive officer of the Board of Regents signed a contract identified as a "Program Participation Agreement,"[3] specifically obligating the State to comply with the provisions of 34 CFR 674 in exchange for the receipt of federal funds. 34 CFR 674.49 provides in pertinent part that:

(a) General. If an institution receives notice that a borrower has filed a petition for relief in bankruptcy, usually by receiving a notice of meeting of creditors, the institution and its agents shall immediately suspend any collection efforts outside the bankruptcy proceedings against the borrower. . . .

(c) Borrower's request for determination of dischargeability.

(1) The institution shall follow the procedures in this paragraph if it is properly served with a complaint in a proceeding under chapter 7, 11, 12 or 13 of the Bankruptcy Code, or under 11 U.S.C. 1328(b), for a determination of dischargeability under 11 U.S.C. 523(a)(8)(B) on the ground that repayment of the loan would impose an undue hardship on the borrower and his or her dependents.

(2) If more than seven years of the repayment period on the loan, excluding periods

---

**2.** *Wyoming Dep't Transp. v. Straight (In re Straight)*, 209 B.R. 540, 548–49 (D.Wyo.1997), *Headrick v. Georgia (In re Headrick);* 200 B.R. 963, 967 (Bankr.S.D.Ga.1996); and *Burke v. Georgia (In re Burke)*, 203 B.R. 493, 497 (Bankr. S.D.Ga.1996).

**3.** Unable to locate the exact agreement which was in effect at the time this student loan was granted, the State submitted a copy of the 1997 participation agreement as representative of the agreement which was in force at the time the debtor obtained his loans.

of deferment granted to the borrower, has passed before the borrower filed the petition for relief in bankruptcy, the institution may not oppose a determination of dischargeability requested under 11 U.S.C. 523(a)(8)(B) on the ground of undue hardship.

(3) If less than seven years of the repayment period on the loan, excluding periods of deferment granted to the borrower, has passed before the borrower filed the petition for relief, the institution shall determine, on the basis of reasonably available information, whether repayment of the loan under either the current repayment schedule or any adjusted schedule authorized under subpart B or D of this part would impose an undue hardship on the borrower and his or her dependents.

(4) If the institution concludes that repayment would not impose an undue hardship, the institution shall determine whether the costs reasonably expected to be incurred to oppose discharge will exceed one-third of the total amount owed on the loan, including principal, interest, late charges and collection costs.

(5) If the expected costs of opposing discharge of such a loan do not exceed one-third of the total amount owed on the loan, the institution shall –

(i) Oppose the borrower's request for a determination of dischargeability; and,

(ii) If the borrower is in default on the loan, seek a judgment for the amount owed on the loan. . . .

In *Innes v. Kansas State University*, 207 B.R. 953 (Bankr.D.Kan.1997), the court considered circumstances virtually identical to this case and concluded that Kansas State University was bound by the terms of just such an agreement and could be sued in the bankruptcy court. The court reasoned that more was involved than a mere receipt of federal funds because the Kansas legislature had enacted a statute which expressly provides that:

The board of regents, or any state educational institution with the approval of the board of regents, may make and file applications for federal funds appropriated and made available by federal law for purposes related to the operation or function of such board or institution. The board of regents, or any state educational institution with the approval of the board of regents, may receive from the federal government, or any of its agencies, any funds made available under existing law, rules or regulations, or that may hereafter be made available. The board of regents, or any state educational institution with the approval of the board of regents, may expend the same in accordance with the law, and the rules, regulations and requirements under which such funds are made available. Such moneys shall be expended only in accordance with and for the purposes specified in federal law. Federal funds shall be deposited in the state treasury.

K.S.A. § 76–723.

The court concluded that the state had indicated its unequivocal consent to federal jurisdiction because of its express legislative authorization to be bound by a specific set of federal regulations. *Innes*, 207 B.R. at 954. The State of Kansas can thus be deemed to have voluntarily and knowingly accepted the terms of the "contract" as required by *Pennhurst*.

■ In contrast to the specific legislative consent to federal jurisdiction in Kansas, the Nebraska Constitution and statutes are silent on the issue. The Nebraska Constitution provides that "[t]he state may sue and be sued, and the Legislature shall provide by law in what manner and in what courts suits shall be brought." Neb.Rev.St. Const. Art. V, § 22. This section is not self-executing, but requires legislative action for waiver of a state's sovereign immunity. *Riley v. State*, 244 Neb. 250, 506 N.W.2d 45 (Neb.1993).

The relevant Nebraska statute concerning the powers of the Board of Regents does not specifically authorize the Board or any of its officials to waive the State's Eleventh Amendment immunity from suit in federal court. Nebraska Revised Statute § 85–105 (1994) provides that: "[t]he Board of Regents shall have full power to appoint its own presiding officer and secretary. It shall constitute a body corporate, to be known as the Board of Regents of the University of Ne-

braska, and as such may sue and be sued and may make and use a common seal and alter the same at pleasure. It may acquire real and personal property for the use of the university and may dispose of the same whenever the university can be benefited thereby, except that it shall never dispose of grounds upon which a building of the university having a market value in excess of five hundred thousand dollars is located without the consent of the Legislature."

In *Board of Regents of University of Nebraska v. Dawes*, 370 F.Supp. 1190 (D.Neb. 1974), the United States District Court for the District of Nebraska concluded that Neb. Rev.Stat. § 85–105 does not grant the institution the power to waive immunity from suit in federal court. Even if the debtor in the instant case could show that the Board of Regents voluntarily and knowingly accepted the terms of the agreement, the Board of Regents did not have the power to waive the State's immunity. The State, therefore, cannot be sued in the bankruptcy court by a debtor requesting a hardship discharge, even though the contract, by which the State obtains funds or guarantees from the federal government, requires the institution to litigate the issues in federal bankruptcy court.

### C. *Hardship Discharge Litigation—Appropriate Forum Availability*

■ Chief Justice Rehnquist, writing for the majority in *Seminole*, stated that at least three methods exist for ensuring the states' compliance with federal law. According to Justice Rehnquist, the federal government can bring suit in federal court against a state; an individual can bring an *Ex parte Young*[4] action against a state officer in order to ensure that the officer's conduct is in compliance with federal law; and the Supreme Court may review a question of federal law arising from a state court decision if a state has consented to suit in its own courts. *Seminole*, 517 U.S. at 71, 116 S.Ct. at 1131.

None of these three methods necessarily guarantees an appropriate forum to consider the hardship discharge question. First, in the instant case, the debtor is a private individual, not a federal entity. Second, the *Ex parte Young* doctrine, although touted by legal commentators as a formidable tool in the bankruptcy context, provides virtually no assistance to the debtor seeking a discharge. As long as the state honors the automatic stay, there simply will be no "on-going violation" upon which to premise an *Ex parte Young* action. Finally, Justice Rehnquist limited the Court's review of decisions to those wherein a question of federal law arises from a state court decision in which a state has consented to suit.

Although an individual citizen of Nebraska cannot sue the State in federal court, that citizen can sue the State in state court to attempt to obtain a discharge of a student loan. The Nebraska Legislature has already expressly waived the sovereign immunity of the Board of Regents in state court proceedings by enacting Neb.Rev.Stat. § 85–105. As a result, this debtor can refile this adversary proceeding in state court. The right to file in state court is better for the debtor than being entirely barred from pursuing a hardship discharge. However, the fact that a debtor's only litigation forum is state court means that the debtor is barred from the forum most uniquely qualified to resolve the factual issue concerning "undue hardship" as that term is used in the bankruptcy context.

The student loan program is a federal program, authorized by federal statutes and administered pursuant to federal regulations. The regulations anticipate that some borrowers will file bankruptcy and request "hardship discharges." The federal bankruptcy system is designed to accommodate such litigation. The bankruptcy system even recognizes the impecunious status of a debtor who believes it would be an undue hardship for the debtor and dependents of the debtor if the debtor cannot be relieved of the student loan obligation. Because of such recognition, a debtor plaintiff is not required to pay the ordinary Adversary Proceeding filing fee

---

**4.** Under the *Ex parte Young* doctrine, a state officer may be sued in federal court for prospective injunctive relief to stop that officer from violating rights guaranteed by a federal statute.

*Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908); *Seminole*, 517 U.S. at 45, 116 S.Ct. at 1118.

which is currently $150.00. The state courts, although perfectly capable of handling the discharge-ability litigation, do not waive the filing fee for debtors and do not have the institutional memory or frequent contact with the factual and legal issues concerning bankruptcy discharge litigation in general, or hardship discharge litigation in particular. Removing isolated issues of discharge to state court from the context of a larger bankruptcy proceeding in bankruptcy court removes the ability of a bankruptcy court to review a debtor's entire financial picture and to ensure an equitable result for both the debtor and all creditors. *See Gardner v. New Jersey,* 329 U.S. 565, 67 S.Ct. 467, 91 L.Ed. 504 (1947), and *Schmitt v. Missouri W. State College,* 220 B.R. 68 (Bankr.W.D.Mo. 1998).

D. *The United States of America as a Party*

■ The State entered into an express contract with the federal government. Although the contract explicitly provides under which circumstances the State is to participate in the borrower's adversary proceeding in bankruptcy court, the debtor is powerless to enforce the contract, despite the benefits which clearly accrue to the debtor pursuant to the contract. There is no ongoing violation upon which to premise an *Ex parte Young* action and the debtor is not a federal entity. Absent intervention by the federal government, the State can use the benefits of the Student Loan Program and, with impunity, breach the contract which allowed the State to receive such benefits.

The motion to dismiss filed by the State should be granted, but dismissal shall not be entered at this time because there is an original party to this action that can sue the State in the bankruptcy court. That party is the United States of America. The United States of America was a party to this action and was sued in the name of the United States Department of Education. In that capacity, the United States of America requested to be dismissed as a defendant for the reason that the student loans in question were made under the Student Loan Program and the State was empowered to represent

the interests of the federal government. By such assertion the United States implied that the State would comply with its contract and the applicable federal regulations concerning student borrowers who file bankruptcy and request a hardship discharge.

The requested dismissal of the United States was granted. It now appears that granting the motion to dismiss was improvident because there certainly is a basis for the United States to be a party to this action. The State contracted with the United States to take specific actions if a borrower under the Student Loan Program filed bankruptcy and requested a hardship discharge of the student loan. Those contractual obligations include:

a) declining to contest the discharge of a student loan in repayment status for more than seven years; (if the Board of Regents asserts its immunity in such a case, even a statutorily dischargeable debt cannot be discharged without the debtor suing in state court).

b) determining if it appears repayment under any schedule would impose an undue hardship on the debtor and the dependents of the debtor; (if the Board of Regents asserts its immunity from suit in federal court, it need not even concern itself with the "facts" unless it is actually sued in state court).

c) calculating the costs expected to be incurred to oppose the discharge if it is determined by the state officials that the repayment will not impose an undue hardship;

d) opposing the request for determination of dischargeability and seeking a judgment if the expected costs of opposing the discharge do not exceed one-third of the total amount owed on the loan.

In summary, the State has contracted with the United States of America to take certain actions concerning borrowers who attempt to obtain a hardship discharge in the bankruptcy court. The actions that are required of the Board of Regents do not simply benefit the United States of America. They also provide a federal litigation forum for the debtor and provide a procedure by which the debtor can obtain a thoughtful review of the

facts concerning the debtor's situation and, in some cases, without additional expenses being incurred by either party, permit the debtor to obtain a hardship discharge of the student loan on an uncontested basis. In this case, the Board of Regents, by asserting immunity from suit in federal court, ignores its contractual obligations to the United States and to the debtor.

Now that the position of the Board of Regents is clear and now that the contractual provisions of the student loan program are in the record, it is appropriate to alert the United States of America concerning its opportunity to vindicate its contractual rights and assure that a student loan borrower who becomes a bankruptcy debtor has a federal forum in which to litigate the hardship discharge issues of this debtor.

*Conclusion*

The clerk of the bankruptcy court is directed to provide to the United States Attorney for the District of Nebraska a copy of this memorandum and order. Within sixty days of receipt of the memorandum, the office of the United States Attorney is invited to either file a motion to intervene in this adversary proceeding or to inform the parties and the court that it declines to intervene. If the United States moves to intervene and such motion is granted, this case will continue in the bankruptcy court with the United States of America and the debtor as named plaintiffs. If the United States declines to intervene, the case will be dismissed without prejudice.